Earl BAKER, Appellant-Plaintiff,

v.

CHAMPION MOTOR HOME CO., INC., Appellee-Defendant.

No. 20A03–8607–CV–190.

Court of Appeals of Indiana, Third District.

March 24, 1987.
Rehearing Denied May 11, 1987.

Edward A. Chapleau, South Bend, for appellant-plaintiff.

Timothy J. Walsh, South Bend, for appellee-defendant.

STATON, Judge.

Baker contests a jury award of $2,000 for injuries he sustained when his foot went through a step on a motor home. He raises two issues for our review:

(1) Whether the damage award is inadequate as a matter of law.

(2) Whether the verdict is contrary to the evidence.

We affirm.

The evidence at trial revealed, in pertinent part: In November 1978, Earl Baker, James Welker, and Baker's father went on a trip to Maryland in Baker's motor home. One day, as Baker was exiting the motor home, his foot went through the step. While Welker did not see Baker fall, he knew right away that Baker had fallen. Baker pulled up his pant leg and he and Welker saw some scratches on his foot and ankle.

Baker did not seek any medical attention while on the trip. He thought that he had just sprained his ankle. Upon his return, he was still experiencing pain, so he called his family physician, Dr. Reed, and received a pain medication. He missed four days of work.

Dr. Reed first saw Baker in person on January 18, 1979. His examination revealed tendonitis in the ankle. According to Dr. Reed's testimony, tendonitis is an inflammation of the tendon; it can be caused by injury, but frequently, doctors do not know what has caused it.

Dr. Reed injected Cortisone directly into the ankle. He saw Baker again on January 26, 1979, and the ankle was much better. On February 7, 1979, when a flare-up of tendonitis occurred, Dr. Reed again injected Cortisone into the ankle. Dr. Reed saw Baker on February 14, 1979, and February 22, 1979. On February 22, 1979, he noticed, for the first time, that Baker's foot was slipping when he walked. He diagnosed it as a "drop foot," and referred him to an orthopedist, Dr. Gabriel.[1]

Dr. Gabriel saw Baker on April 9, 1979. Baker did not complain of any pain on that day. Baker told Dr. Gabriel about the November 1978 accident, but added that in February 1979, at his apartment, he had missed a step and fallen down two steps, twisting his left foot.

Dr. Gabriel watched Baker walk and thought he showed very little drop foot. The doctor also found that Baker had very little disability while running. Dr. Gabriel concluded that Baker had a drop foot due to the absence of the function of the tibialis anterior muscle in the ankle. He did not feel that Baker's condition was severe enough to require a brace.

In August 1979, Baker was involved in an automobile accident. He suffered a fracture of the upper tibia, the bone of the right lower leg. Dr. Gabriel treated that injury from February 12, 1980, to June 1981. As a result of this injury, Baker sustained permanent impairment; he suffered arthritic changes in the right knee and his knee curved backwards when he stood due to the laxity of the muscles.

In April 1980, due to the right leg injury, Dr. Gabriel advised Baker not to play sports and not to work. He sent Baker to physical therapy twice a week. Baker used a cane for a time because of his right leg injury.

On June 26, 1980, Dr. Gabriel told Baker that he could return to work. In January 1981, Baker continued to have difficulty with his right leg. In June 1981, Dr. Ga-

1. A "drop foot" is a paralysis of the muscle that lifts the foot up, according to Dr. Gabriel's testimony. He said that when a person with a drop foot walks, the front part of the foot drops down and slaps the floor; the toes or the foot cannot be lifted up.

briel and Baker discussed the possibility of surgery for the left foot condition.

Dr. Gabriel ordered a nerve conduction test and electric studies of the left foot muscles. The test results were essentially normal. The electric studies showed good nerve conduction of the left foot and no complete interruption of the nerve between the shin and the ankle.

Dr. Gabriel sent a consultation report to Dr. Reed which stated, in part: "I am not sure which injury caused the nerve damage, whether it was the October [sic], 1978, or February, 1979, injury."

Dr. Keucher, a neurosurgeon, examined Baker at the request of Baker's attorney. He ordered a bone scan; it showed arthritic changes in the left foot. The doctor could not state that the arthritic changes were caused solely by the November 1978 accident. He said they could have been the result of normal aging.

Dr. Keucher stated that one of the manifestations of a permanent nerve injury in the left foot would be atrophy. However, he did not find any atrophy in Baker's left foot.

Dr. Keucher found a hole in the location of the anterior tibial tendon of the ankle. He said that the tendon had been torn or ruptured and had caused a drop foot. He said he believed that such a rupture would have occurred in February 1979, when Baker twisted his left foot a second time. He testified that the drop foot was permanent.

Dr. Heller, a board certified orthopedist, was given a history of Baker's injuries and treatment, and he examined Baker. He found no evidence of a drop foot, and, although he said there tends to be excessive wear over the toe area of the shoe of a person with a drop foot, he noticed no excessive wear to Baker's left shoe. Baker testified, though, that he only wore those shoes upon occasion.

Dr. Heller could feel the defect in the anterior tibial tendon and stated the defect was due to a rupture of the tendon. He stated that the type of injury Baker incurred in November 1978 could not have caused a rupture of the tendon and, in turn, a drop foot.

He also stated that the two Cortisone injections made by Dr. Reed could have weakened the tendon, causing Baker to stumble and twist his foot in February 1979. He noted that the injections had occurred before that accident. Dr. Heller believed that the second accident to the left foot ruptured the tendon.

At the time of the November 1978 accident, Baker was part owner of a business known as "Toot 'N Tellum," an auto body shop and wrecker service. Baker claims that he lost considerable wages as the result of the November 1978 accident and that his future earning capacity was impaired.

Baker's personal income tax returns showed that in 1978, he reported wages of $22,100; in 1979, $24,700; in 1980, $21,546; in 1981, $25,175; in 1982, $24,700; and in 1983, $23,834.91. In 1984, his wages were $15,300, but he sold the business in that year for $320,000. He received an immediate payment of $35,000 and will receive $1,500 a month through 1991. The immediate payment of $35,000 did not appear on Baker's personal income tax return for 1984. In addition, although his 1981 business tax return shows compensation to officers totalling $49,400 (Baker was an officer), this income did not appear on Baker's 1981 personal income tax return.

Baker said he sold the business because his left foot injury made it impossible for him to operate the clutch mechanism on a big wrecker. As late as August 1979, he was operating a small wrecker. Baker testified in a deposition (in connection with the automobile accident case) that, before the November 1978 accident, his partner had handled the big wrecker more than he had because his partner was more familiar with its operation.

Dr. Heller stated that, in his opinion, Baker could operate a clutch mechanism. He stated that Baker did not have any weakness of the motion which would prohibit his operation of the clutch. He said he had seen many patients with similar problems who had done the same type of

work and some with worse problems who had participated in very vigorous physical activities.

An economist, James Koch, testified that Baker had lost wages in the amount of $60,000 and had an impaired earning capacity of $375,906.

Baker's medical expenses for the drop foot condition totalled $1,133.66. Baker testified that he suffers pain in his foot, that he trips and falls on many occasions, that he cannot stand for long periods of time; that he is nervous as a result of these problems, and that he wears a brace to support his foot.

## I.

### Whether Damage Award Inadequate

■ Indiana courts have set a strict standard of review for appeals predicated upon the excessiveness or insufficiency of awarded damages. A verdict will only be reversed when it is apparent from a review of the evidence concerning the injuries that the amount of damages assessed by the jury is so small or so great as to indicate that the jury was motivated by prejudice, passion, partiality or corruption or considered some improper element. *McNall v. Farmers Ins. Group* (1979), 181 Ind.App. 501, 392 N.E.2d 520, 525, *trans. denied* (1981), Ind., 423 N.E.2d 593.

Baker argues on appeal that the jury was improperly influenced by one of the jurors, Dr. Wellington, to reduce the amount of the damage award. He points to Dr. Wellington's voir dire examination, where Dr. Wellington stated that: (1) if he served on the panel, he would have to forego a Florida vacation; (2) he had strong feelings about litigation; (3) he felt that negligence must be shown in addition to evidence that Baker was unable to receive income from another line of work; (4) he questioned whether the award should be very much because Baker could walk; and

(5) he had reservations about Baker's claim without even knowing the facts.[2]

Baker contends that:

Dr. Wellington was obviously a leader on the jury because of his education and professional status. The fact that the court stated that it knew Dr. Wellington for 20 years would surely impress the other members of the jury that Dr. Wellington was respected by the court. Plaintiff contends that this verdict cannot possibly be explained upon any reasonable hypothesis other than the prejudice and partiality of Dr. Wellington and his influence upon the other members of the jury.

Appellant's Brief at page 8.

■ However, this argument was not included in Baker's Motion to Correct Errors or the accompanying memorandum of law. He only states: "The amount of damages were inadequate." (R. 12–16.) Trial Rule 59(D)(2) provides that each claimed error "shall be stated in specific rather than general terms, and shall be accompanied by a statement of the facts and grounds upon which the errors are based." A party who fails to bring an argument to the attention of the trial court in his motion to correct errors has waived the issue. *Rogers v. Rogers* (1982), Ind.App., 437 N.E.2d 92, 95. Claims or arguments presented for the first time in appellant's brief are not properly before the Court of Appeals. *Id.*

■ Even if Baker had properly preserved his argument for appeal, it is without merit. Dr. Wellington also stated during the voir dire examination that: (1) he would do his best to listen to the case even though he had vacation plans; (2) he could be fair even though he had some preconceived ideas about the case; (3) he would follow the law as given by the court and he definitely would listen to the facts and apply the law to those facts; (4) he could be fair and impartial; (5) if he did not get to go to Florida he was not going to hold it against either party; and (6) he felt both

2. Baker had used all of his peremptory challenges and the judge denied his challenge for cause.

parties were starting with a "clean sheet."[3]

In *Williams v. State* (1981), Ind., 426 N.E.2d 662, *reh. denied,* a prospective juror testified that upon seeing the defendant in court, he drew a first impression that the defendant was cocky, that he might possibly have a little bit of prejudice against the defendant, that he had some doubt whether he could successfully set his prejudice aside, and that he would not want a juror in this state of mind if he were on trial. However, the Court held that the trial court did not err in denying the defendant's challenge for cause where the juror also stated that he would study the facts and go by them and the law, and there was a one percent chance that he might be unsuccessful in suppressing his first impression. *Id.* at 669.[4]

And, in *Porter v. State* (1979), 271 Ind. 180, 391 N.E.2d 801, *reh. denied, overruled on other grounds, Fleener v. State* (1980), 274 Ind. 473, 412 N.E.2d 778, 781, *reh. denied,* a prospective juror stated that because of her business it would be diffi-cult for her to sit. She indicated that if the trial lasted ten to fifteen days she would be very concerned about her business. There, the Court held it was not an abuse of discretion to deny the defendant's challenge for cause when the juror also stated that she would be able to set aside such concerns and would not hold the length of the trial against either defendant in any way and would be able to be a fair and impartial juror. *Id.,* 391 N.E.2d at 816.[5]

## II.

*Whether Verdict Contrary to Evidence*

■ We may not reverse a damage award if it is within the scope of the evidence before the trial court, and we shall not reweigh the evidence or judge the credibility of the witnesses who presented it. *Nahmias Realty, Inc. v. Cohen* (1985), Ind. App., 484 N.E.2d 617, 620, *trans. denied.*

Even if improper elements were considered in the trial court, Baker must unequivocally demonstrate that the damage

---

3. Although Baker argues that Dr. Wellington was "obviously" a leader on the jury, it was juror Charlwood who was selected foreperson. The judge's comment that he had known Dr. Wellington for twenty years was made when the jury was absent.

4. Baker concedes that the denial of a challenge for cause is within the discretion of the trial court (See *Woolston v. State* (1983), Ind., 453 N.E.2d 965, 967, *reh. denied*), and states that he is not arguing that the judge abused his discretion in denying his challenge to Dr. Wellington. Yet, that is precisely the argument he is making. Baker's "evidence" of Dr. Wellington's prejudicial influence on the jury consists only of Dr. Wellington's voir dire examination. There is no evidence of improper statements or conduct during the jury's deliberations. The judge heard Dr. Wellington's comments during voir dire, but found that he could be a competent juror. Any challenge to Dr. Wellington's competency, therefore, is a challenge to the judge's decision, and hence, his discretion. Because of that, both *Williams, supra,* and *Porter v. State* (1979), 271 Ind. 180, 391 N.E.2d 801, *reh. denied, overruled on other grounds, Fleener v. State* (1980), 274 Ind. 473, 412 N.E.2d 778, 781, *reh. denied,* are applicable and persuasive here.

5. It would be appropriate to reverse the verdict here if the amount of damages assessed by the jury was so small as to indicate it was motivated by some prejudice, passion, partiality, corruption, or improper element other than Dr. Wellington's alleged improper influence upon it. It is not necessary that the plaintiff show, or that this Court determine, the exact cause or nature of the error in assessment or the amount of recovery. *Thompson v. Town of Fort Branch* (1931), 204 Ind. 152, 178 N.E. 440, 444. However, damages will not be deemed the result of improper considerations unless the size of the award cannot be explained on any other reasonable ground. *Crump v. Rhodes* (1986), Ind. App., 488 N.E.2d 741, 743, *reh. denied.* In *Wickizer v. Medley* (1976), 169 Ind.App. 332, 348 N.E.2d 96, *trans. denied,* the Court held that a damage award of $5,600 was not inadequate when the jury could have determined that part of the plaintiff's problem was caused by arteriosclerosis and not by a car collision. *Id.,* 348 N.E.2d at 99. Here, the jury may have determined that part or most of Baker's inability to work, or a portion of his pain and suffering, was caused by the February 1979 accident or the August 1979 accident and not by the November 1978 accident. Where the evidence presented is conflicting as to the nature, extent, and source of the injury, the jury is in the best position to assess damages. In such cases, the verdict returned by the jury cannot be said to be based upon prejudice, passion, partiality or corruption or the consideration of some improper element. *McNall, supra,* 329 N.E.2d at 525.

award is not within the scope of the evidence because:

> [t]he standard of review applied by this court requires that we affirm a trial court's action if it can be sustained on any legal theory. *Llewellyn v. Beasley* (1981), Ind.App., 415 N.E.2d 789 [, *reh. denied*]. We do not presume error by the trial court, and the burden of proving that reversible error occurred is on the appellant.

*Nahmias* at 620. Thus, we will sustain the trial court if its judgment regarding damages falls within the limits established by the probative evidence. *Id.*

It was stipulated by the parties and the jury was instructed that Baker was 46 and had a life expectancy of 26.63 years. The jury was also instructed that it could consider the following elements of damage:

1. The nature and extent of the injuries.
2. Whether the injuries are temporary or permanent.
3. The physical pain and suffering which Baker had suffered in the past or which he may reasonably be expected to suffer in the future.
4. Any mental suffering which the plaintiff has suffered or will suffer in the future.
5. Aggravation of a pre-existing condition, if any.
6. The value of the lost earnings.
7. The value of the loss of impairment of earning capacity and wage losses in the future.
8. Any disability of bodily function which Baker may have suffered since the occurrence or which he may suffer in the future as a result of this occurrence.

Baker argues that it is "incomprehensible" that after ruling in his favor, the jury could value all of the elements of damage at "the paltry sum of $2,000." Baker contends that because the jury found in his favor, the defendant is liable to him for all of the damages he claims to have sustained as the result of the November 1978 accident.

This is the same argument the plaintiff made in *Spannuth v. Cleveland C.C. & St. L. Ry. Co.* (1925), 196 Ind. 379, 148 N.E. 410. There, the Court stated that this argument asks it to infer that the jury agreed upon a finding that the defendant was solely liable to the plaintiff for all the damages the plaintiff had sustained. The Court said:

> But if resort were had to inferences we might as reasonably infer that the jury became convinced that plaintiff ... was injured solely by reason of his own negligence, but agreed to award him enough damages to protect him from liability to pay the costs of suit.

*Id.*, 148 N.E. at 411. The Court then held that where it is reduced to the necessity of indulging presumptions or drawing inferences, it will adopt those presumptions and those inferences which tend to support the trial court. *Id.* See also *Fairmount Glass Works v. Cub Fork Coal Co.* (1933), 287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439 (Verdict may have represented a finding for the defendant.) *Id.* at 484, 53 S.Ct. at 255.

Here, Baker is asking us to infer that: (1) the jury agreed that, as a result of the November 1978 accident, Baker was unable to work at Toot 'N Tellum; he lost wages of $60,000; he had an impaired earning capacity of $375,906; he had medical expenses of $1,133.66; and he endured pain and suffering; and (2), in disregard of the evidence and the law, it found such damages to amount only to $2,000.

■ However, the evidence most favorable to the defendant showed: (1) that Baker only missed four days of work immediately after the accident; (2) according to Dr. Heller: Dr. Reed did not diagnose a drop foot until after the February 1979 accident; Dr. Reed's Cortisone injections may have weakened Baker's ankle, causing him to stumble in February 1979; he found no evidence of a drop foot; the ruptured tendon could not be the result of the November 1978 accident; and he saw no reason why Baker could not operate a clutch; (3) according to Dr. Gabriel: Baker suffered only a mild foot drop and no brace

was necessary; in fact, he was not sure what caused the nerve damage, whether it was the November 1978 or the February 1979 accident; (4) according to Dr. Keucher, the ruptured tendon could not be the result of the November 1978 accident; (5) Baker suffered serious and permanent injuries in an automobile accident in August 1979 and missed a year of work; he was told he could return to work in 1980; (6) as late as August 1979, he was operating a small wrecker; and (7) Baker's personal income tax returns did not reflect all of his earnings in 1981 or 1984.

Therefore, "we might as reasonably infer that the jury became convinced" that Baker's inability to work and his pain and suffering were primarily due to his accidents in February 1979 and August 1979, but agreed to award him enough damages to cover the medical expenses shown and $866.34 for the pain and suffering the jurors felt resulted from the November 1978 accident. See *Wagner v. Riley* (1986), Ind. App., 499 N.E.2d 1155, *trans. pending* (In personal injury actions, the jury is not required to award substantial dollars for pain and suffering; nominal damages are appropriate under proper circumstances. *Id.* at 1159).

As in *Spannuth,* we will adopt those presumptions and those inferences which tend to support the action of the trial court.

Affirmed.

CONOVER, P.J., and HOFFMAN, J., concur.