**TRANSPORT INSURANCE CO.,**
**Appellant (Defendant Below),**

v.

**TERRELL TRUCKING, INC., Appellee**
**(Plaintiff Below).**

No. 36A04–8604–CV–113.

Court of Appeals of Indiana,
Fourth District.

June 25, 1987.

John W. Mead, Mead, Mead & Thompson, Salem, for appellant.

William E. Vance, Vance & Phillips, Seymour, for appellee.

YOUNG, Judge.

Transport Insurance Company appeals from a judgment of $58,365 in compensatory and $6,000 in punitive damages rendered in favor of its insured, Terrell Trucking; Inc. Transport raises the following Issues:

1) whether the trial court erred in denying its petition for declaratory judgment in which it requested that the trial court declare that the payment of loss provisions rather than the limit of liability provisions of the insurance contract controlled the parties' dispute;

2) whether the trial court erred in modifying an instruction and in refusing to give others tendered by it;

3) whether the jury's award of $58,365 in compensatory damages is excessive and not supported by sufficient evidence; and

4) whether the trial court erred in denying its motion for judgment on the evidence as to the issue of punitive damages and whether the jury's award of punitive damages is supported by clear and convincing evidence.

We affirm.

In January of 1983, Gerald Terrell bought a 1971 International Harvester truck tractor for $5,000. The truck was transferred to Terrell Trucking, Inc. and $3,400 in engine repairs were performed. Additionally, a roof-mounted air conditioner was installed. In November of 1983, Terrell purchased an insurance policy issued by Transport Insurance Company. Although Gerald Terrell believed the truck was worth between $10,000 and $12,000, he insured the truck for only $7,000 because that amount of coverage satisfied the bank which had taken the truck as collateral and because that was all that Terrell could afford.

On March 28, 1984, the truck was damaged in an accident. Gerald Terrell informed the agent who sold him the policy of the claim and the agent informed Trans-

port. Transport employed an adjuster and one of the adjuster's employees, John Winkler, was assigned to adjust Terrell's claim.

Winkler appraised the cost of repair to the truck as $8,929.40 and on April 18, 1984 offered Terrell two settlement options. Under the first option, Transport would pay the $7,000 stated policy limit, less the $500 deductible, and keep the truck as salvage. Under the second option, Transport would pay $3,313 and Terrell could keep the truck for its salvage value which Winkler estimated to be $3,100. Terrell refused both of these offers, believing that the truck could be repaired for less than the policy limit and that the salvage value of the truck was greater than $3,100.

After declining the options, Terrell requested that he and Winkler meet to review the records on the truck. Winkler refused and stated that he had decided the truck was a total loss and that Terrell could take it or leave it. Terrell replied that he thought Winkler was being a "crooked-son-of-a-bitch." (R. 253).

A few days after the conversation, Terrell received a $6,698 estimate to repair the truck. Although he took this estimate to Winkler's office and that office showed copies being forwarded to Transport, Winkler claimed that he did not receive the estimate. Terrell sent another copy of the estimate to Winkler. After Winkler and Transport received the estimate, Transport's regional claims supervisor refused to agree to pay the $6,698 amount because it was close to the policy limits. He anticipated that further damage would be discovered once the truck was torn down. Apparently, the parties did not communicate with each other between July 20, 1984 and September 11, 1984.

On September 24, 1984, Winkler and the repairman met at Terrell's residence and the two reached a $5,523.96 repair contract price on the truck. The difference between the estimate and contract price was due to the fact that the contract price was based on after market rather than original International parts. After Winkler and the repairman reached the agreement, Winkler told Terrell that "we'd had this settled six months ago ... if you hadn't called me a crooked son of a bitch, but ... when you done that, I put your folder to the bottom of the file and I let you set." (R. 257) Terrell agreed to accept the contract price if Transport would pay his attorney fees. Winkler stated that if Terrell's attorney fees were not over $1,000 he would recommend Transport settle and that Terrell should have a check within two weeks. Transport's regional supervisor, however, refused to authorize the repairs because he believed they still would have exceeded the policy limits.

At the end of September, Transport offered to settle for the $7,000 policy limits less the deductible, towing and storage bills. It would keep the truck as salvage unless Terrell wanted the truck, then it would sell it back to him. Terrell's attorney refused and filed a complaint on Terrell's behalf on October 10, 1984. The complaint requested punitive as well as compensatory damages.

Prior to trial, Transport petitioned the trial court to declare that the payment of loss provisions rather than the limit of liability provisions of the policy controlled its dispute with Terrell. The court denied this petition. At trial, Gerald Terrell testified that the truck brought in between $3,000 and $3,500 a month for the three months prior to the accident. Documentary evidence showed the truck generated $9,635.70 in net earnings during this period. Transport's regional claims supervisor admitted that Terrell was entitled to have the truck repaired unless it was a total loss. He also admitted that Transport was entitled to salvage only if the truck was a total loss. The jury returned a verdict in favor of Terrell in the amount of $58,365 in compensatory and $6,000 in punitive damages.

Transport first contends that the trial court erred in denying its petition for declaratory judgment. This petition requested the trial court to declare that the payment of loss provisions rather than the limit of liability provisions of the insurance

contract controlled the parties' dispute. These provisions provided:

SECTION D—AUTOMOBILE PHYSICAL DAMAGE INSURANCE (Non-Fleet) ...

II. LIMIT OF LIABILITY: The limit of the company's liability for loss to any one covered automobile shall not exceed the least of the following amounts:

(a) the actual cash value of such *covered automobile*, or if the *loss* is to a part thereof the actual cash value of such part, at time of *loss*; or

(b) what it would then cost to repair or replace such *covered automobile* or part thereof with other of like kind and quality, with deduction for depreciation, or

(c) the limit of liability stated in the declarations as applicable to 'each *covered automobile*' under the coverage afforded for the *loss* to such *covered automobile*, provided that if such limit of liability is expressed as a stated amount it shall, with respect to a *covered automobile* newly acquired during the policy period and not described in the declarations, but deemed as having been replaced by 'actual cash value'.

(d) If the amount of loss is less than the limit of liability stated in the declarations then the company's liability shall be limited to the lesser of:

(i) the portion of the loss that the limit of liability of the vehicle bears to the actual cash value of the vehicle at the time of loss; or

(ii) the actual cash value of vehicle. If the amount of loss exceeds the actual cash value or the limit stated in the policy, the company may at it's option, repair the insured unit or pay the insured the actual cash value or market value, not to exceed the stated value, and such payment shall entitle the company to all salvage remaining after such loss. . . .

V. CONDITIONS ...

2. *Payment for Loss:* With respect to any *loss* covered by this insurance, the company may pay for said *loss* in money, or may:

(a) repair or replace the damaged or stolen property, or

(b) return at its expense any stolen property to the *named insured*, with payment for *any* resultant damage thereto, at any time before the *loss* is so paid or the property is so replaced, or

(c) take all or any part of the damaged or stolen property at the agreed or appraised value, but there shall be no abandonment to the company. (R. 242–43).

Transport argues that once it determined the amount of loss under the limit of liability provisions, it was entitled to select the method of payment for that loss under the payment of loss provisions. From this argument, Transport asserts that because it had determined the amount of Terrell's loss, the payment of loss provisions unambiguously controlled its dispute with Terrell and it was therefore entitled to have the court declare to the jury that those provisions were controlling. While the construction of an unambiguous written contract is a matter of law for the trial court's determination, *Midwestern Indemnity Co. v. Leffler Construction Co.* (1984), Ind. App., 463 N.E.2d 1130, Transport's argument must fail because the payment of loss provisions do not unambiguously control its dispute with Terrell.

■ The central dispute between Transport and Terrell was the amount of loss sustained by Terrell, not the method of payment. Although Transport may be correct in asserting that it was entitled to select the method of payment once the amount of loss was determined, it incorrectly assumes that it is entitled to be the sole determiner as to the amount of loss. Nothing in the insurance contract gives Transport this authority. On the contrary, through the following provision, the contract contemplates that a dispute as to the amount of loss may occur and provides a remedy for such an occurrence:

SECTION D—AUTOMOBILE PHYSICAL DAMAGE INSURANCE (Non-Fleet) ...

V. CONDITIONS ...

3. *Appraisal:* If the *named insured* and the company fail to agree as to the amount of *loss,* either may, within 60 days after proof of *loss* is filed, demand an appraisal of the *loss.* In such an event the *named insured* and the company shall each select a competent appraiser, and the appraisers shall select a competent and disinterested umpire. The appraisers shall state separately the actual cash value and the amount of *loss* and failing to agree shall submit their differences to the umpire. An award in writing of any two shall determine the amount of *loss.* The *named insured* and the company shall each pay its chosen appraiser and shall bear equally the other expenses of the appraisal and umpire.

The company shall not be held to have waived any of its rights by an act relating to appraisal. (R. 243).

Despite Transport's contention that this appraisal provision is inapplicable because Terrell allegedly failed to file a proof of loss and because no appraisal under this provision occurred, the provision is applicable to the extent it aids in construing other provisions of the contract. "Courts must consider all of the provisions of a contract to ascertain the meaning, not just individual words, phrases or paragraphs and must accept a construction which harmonizes the provisions rather than one which views them as conflicting." *Anderson v. State Farm Mut. Auto. Ins. Co.* (1984), Ind.App., 471 N.E.2d 1170, 1172. Transport's assumption that it was entitled to determine the amount of loss under the limit of liability provisions creates a conflict between those provisions and the appraisal provision. We must therefore reject Transport's interpretation.

Transport concedes that the payment of loss provisions only apply once the amount of loss has been determined. As the amount of loss was still in dispute at trial, the payment of loss provisions did not con-trol the parties' dispute. The trial court therefore properly denied Transport's petition for declaratory judgment.

■ Transport also contends that the trial court erred in modifying one of its tendered instructions and in refusing to give others. The modified instruction dealt with Terrell's duty to mitigate damages. The trial court deleted language from this instruction which pertained to Terrell's ability to recover upon a failure to mitigate and the meaning of a reasonable period of time for mitigation to occur. Transport, however, has waived this issue as it neither objected to the modification at trial nor specified it as error in its motion to correct errors. *Kroll v. Bell* (1982), Ind.App., 433 N.E.2d 71; *Oliver v. Morrison* (1982), Ind. App., 431 N.E.2d 140; Ind. Rules of Procedure, Trial Rule 59(D).

■ For the refusal of a tendered instruction to constitute reversible error, it must be shown that the instruction correctly states the law, the instruction is supported by the evidence, the substance of the instruction is not covered by others which were given and that there is a reasonable probability that substantial rights of the complaining party have been adversely affected. *Duchane v. Johnson* (1980), Ind.App., 400 N.E.2d 193. Two of the instructions which Transport contends the trial court erred in refusing dealt with the limits of liability and the payment of loss provisions of the insurance contract. Transport's tendered Instruction No. Seven is not a correct statement of the law and its tendered Instruction No. Six was not supported by the evidence.

Instruction Six contained a verbatim statement of the limits of liability provisions and concluded with the following:

You are instructed that the provisions of this section establish only the limit of liability of the company under the contract of insurance. In other words, this section provides the method for determining the maximum amount that the company is obligated to pay for the loss sustained by Terrell as a result of the collision which occurred on March 28, 1984.

This section does not control the method, manner or means by which the company may pay for that loss. (R. 163). Instruction Seven contained a verbatim statement of the payment of loss provisions and concluded with the following:

You are instructed that these provisions in the contract provide for the method, manner or means by which the company may pay for the loss sustained by Terrell. Under these provisions, the company has an option to pay for said loss in money or to repair the damaged property or to take all of the damaged at the agreed or appraised value. If you find that the method chosen by the company in which it proposed to settle Terrell's claim is provided for within the terms of this section, then you may find that the company did not breach its contract of insurance; however, if you find that the manner chosen by the company is not provided for in this section, then you may find that the company breached its contract of insurance with Terrell. (R. 164).

■ Transport's Instruction Seven is an incorrect statement of the law. It states that the jury may find that Transport did not breach its contract with Terrell if it finds that the method of payment Transport chose to settle Terrell's claim was provided for in the payment of loss provisions. The jury could have found, and apparently did find, that Transport breached its contract with Terrell by refusing to deal in good faith with Terrell in settling the claim. The instruction implies that the jury only could find a breach occurred on the basis that Transport's method of payment was not provided for in the payment of loss provisions. This is an incorrect statement of the law and therefore was properly refused by the trial court.

Given our discussion of the denial of Transport's petition for declaratory judgment, it should be apparent that the giving of its tendered Instruction Six was not supported by the evidence. The evidence produced at trial showed that the central dispute between the parties was the amount of Terrell's loss. Until that amount was determined, Transport was not entitled to select a method of payment. Whether its selection was controlled by the limit of liability provisions therefore was irrelevant. As the instruction was not supported by the evidence, it was properly refused.

■ Transport also contends that the trial court erred in refusing the following instruction:

DEFENDANT'S INSTRUCTION NO. 8

You are instructed that the policy of insurance issued by Transport to Terrell provided for 'excessive repair time coverage.' This is provided by way of endorsement to the policy.

You are further instructed that said endorsement provides a maximum policy limit of $3,000.00 for such coverage. You are further instructed that this is the only coverage provided by the policy for loss of use or loss of profits.

You are further instructed that this coverage by the terms of the policy does not apply to a total or constructive total loss of the truck and further, does not become effective until the later of the following dates: the 30th day after the date the loss is reported to the company, or the date the policyholder has given to the company written authorization to begin the necessary repairs.

If you find that the provisions of this coverage are applicable, and if you find that as a result of repairs not having been made to the tractor, that Terrell sustained loss of profits, then you may award damages to the Plaintiff for loss of profits in the amount you deem proper, but not to exceed $3,000.00. (R. 164).

This instruction, however, is not supported by the evidence because the policy provision upon which it is based contemplates coverage for repairs that take an excessive amount of time. Transport refused to repair the truck. The issue in this case was whether Transport took an excessive amount of time in settling Terrell's claim, not whether repairs which it refused to authorize took an excessive amount of time to complete. Further, it would be against

public policy to permit an insurer to arbitrarily refuse to settle its insured's claim and then limit its liability for the refusal. "In short, the insurance company may not ignore its insured and then seek refuge in the fine print of its policy." *Indiana Insurance Company v. Noble* (1970), 148 Ind.App. 297, 323, 265 N.E.2d 419, 435. The instruction was properly refused.

Transport also contends that the jury's award of $58,365 in compensatory damages is excessive and not supported by sufficient evidence. In reviewing a jury's damage award, an appellate court will not reweigh the evidence or judge the credibility of witnesses. The award will not be reversed if it was within the scope of the evidence presented at trial. *Baker v. Champion Motor Home Co., Inc.* (1987), Ind.App., 505 N.E.2d 144. The jury's award in this case was within the scope of the evidence presented.

■ It is apparent that a considerable portion of the jury's award is for profits Terrell lost due to its loss of use of the truck. Damages for loss of use may be measured by lost profits if the profits are ascertainable. Lost profits need not be proved with mathematical certainty. *Farm Bureau Mut. Ins. Co. v. Dercach* (1983), Ind.App., 450 N.E.2d 537. Terrell did not have the use of its truck for at least twenty months.[1] Documentary evidence showed that for the three months prior to the accident $9,635.70 in net earnings were acquired from the truck. From these figures, the jury could have awarded Terrell $64,238.00 [2] in compensatory damages solely for lost profits. The $58,365.00 award was well within the scope of evidence presented. The award therefore was not excessive and was supported by sufficient evidence.

Transport's last contention is that the trial court erred in denying its motion for a directed verdict on the issue of punitive damages and that the jury's punitive damage award is not supported by sufficient evidence. As a directed verdict only is appropriate where an issue is not supported by sufficient evidence, Ind. Rules of Procedure, Trial Rule 50(A), we have treated Transport's claim as one based on the sufficiency of the punitive damage evidence.

■ In order to recover punitive damage in a breach of contract action such as this, a plaintiff must prove by clear and convincing evidence that the defendant's conduct exhibited elements of fraud, malice, gross negligence or oppression.[3] Despite this heightened burden of proof at trial, however, the standard of appellate review remains the same. *Bank of New York v. Bright* (1986), Ind.App., 494 N.E.2d 970, 976. Hence, we neither reweigh the evidence nor judge the credibility of witnesses. We look only to the evidence most favorable to the verdict and the reasonable inferences to be drawn therefrom. We determine only if there is substantial evidence of probative value to support the award and will reverse only if the evidence leads but to one conclusion and an opposite conclusion from that reached by the jury. *Orkin Exterminating Co., Inc. v. Traina* (1985), Ind.App., 461 N.E.2d 693, 698.

■ We agree with Transport that a party to a contract has the right to disagree, in good faith, as to the amount of recovery under the contract. (Appellant's Brief, p. 23 *citing Rose Acre Farms, Inc. v. Cone* (1986), Ind.App., 492 N.E.2d 61, 69.) We, however, conclude that Terrell established by clear and convincing evidence that Transport's conduct was oppressive and not the result of a good faith dispute.

Throughout the negotiations between the parties, Transport adhered to its conclusion that Terrell's truck was a total loss and

---

1. The accident occurred on March 28, 1984 and the judgment was not entered until December 17, 1985.

2. This figure is based on the average per month net earnings of the truck as evidenced by Terrell's documents.

3. A plaintiff may also recover punitive damages in a breach of contract action if he demonstrates by clear and convincing evidence that the breach independently established the elements of a common law tort. *Bank of New York v. Bright* (1986), Ind.App., 494 N.E.2d 970, 976 fn. 7.

that it therefore was entitled to pay the $7,000 stated limit and retain the truck as salvage. When Terrell initially disagreed with the adjuster's determination that the truck was a total loss and requested a meeting to review the records and figures, the adjuster refused and told Gerald Terrell that Transport's offer was on a take it or leave it basis.[4] Despite Terrell's receipt of a $6,698.61 estimate and later a $5,523.96 contract price [5] to repair the truck, Transport refused to settle by claiming the repairs would still exceed the $7,000 policy limit. At trial, Transport's regional claims supervisor admitted that Terrell would be entitled to have the truck repaired if it could be repaired for less than the $7,000 policy limit. He also admitted that Transport would be entitled to the truck as salvage only if the loss exceed the $7,000 policy limit.

Given the figures and the regional claims supervisor's testimony, there is clear and convincing evidence that Transport refused to settle a claim which in good faith it could not dispute. Transport admitted at trial that Terrell was entitled to have the truck repaired if it could be repaired for less than $7,000. Yet Transport refused to settle Terrell's claim when a contract repair price of $5,523.96 was reached between its adjuster and a repairer.

**4.** Transport actually made two offers. Both of them, however, involved Transport declaring the truck as a total loss and it either claiming the truck as salvage or receiving credit value for the salvage.

**5.** Both parties agreed that a contract price is one to which no supplements could be added even if further damage was later discovered. Terrell also wanted Transport to pay his attorney fees if it agreed to repair the truck at the $5,523.96. While Transport may not have been liable for such fees at that time, its refusal was not based on the requested fees but on its continued adherence to the claim that the repairs would have exceeded the $7,000 policy limit. It did not make a counter proposal to pay for the repairs but not the attorney fees. Rather, it simply reverted to its original offers which were based upon the repairs exceeding the policy limit. We therefore have not viewed Terrell's request for attorneys fees as justifying Transport's refusal to pay for repairs. Furthermore, we note that an insured should not be required to hire an attorney to recover a claim which the

Transport continually argues that because it offered to pay the maximum it was obligated to pay under the policy it cannot be found to have refused to deal in good faith. Given the particular policy in question, we disagree. Upon payment of the maximum amount, Transport was entitled to the truck as salvage. By its own estimations, the truck had a salvage value of $3,100. By declaring the truck a total loss, Transport's net loss would have been $3,900. Paying the policy limit rather than repairing the truck would have resulted in an actual benefit to Transport. The jury could have reasonably inferred that Transport was essentially attempting to reduce its own loss by arbitrarily, and despite estimates to the contrary, declaring Terrell's truck a total loss. We cannot condone such a practice.

> The insurer's obligations are ... rooted in their status as purveyors of a vital service labeled quasi-public in nature. Suppliers of services affected with a public interest must take the public's interest seriously, where necessary placing it before their interest and maximizing gains and limiting disbursements.

*Liberty Mut. Ins. Co. v. Parkinson* (1985), Ind.App., 487 N.E.2d 162 *quoting Egan v. Mutual of Omaha Insurance Co.* (1976), 24 Cal.3rd 809, 169 Cal.Rptr. 691, 620 P.2d 141.

insurer could not in good faith dispute. *Liberty Mut. Ins. Co. v. Parkinson* (1985), Ind.App., 487 N.E.2d 162. Terrell had already received an estimate for repairs which was less than the $7,000 policy limit and which had been refused by Transport. While that estimate was not firm and the repairs therefore eventually may have exceeded the policy limit, we agree with Terrell's counsel that Transport acted throughout its dealings with Terrell as if it had never heard of obtaining a release of liability in exchange for issuing a check for repairs. We find it difficult to believe that an insurer would have no knowledge of such a procedure. By using the release procedure, Transport could have agreed to pay for the repairs at the initial estimate price without incurring costs above the policy limit. Its failure to use such a procedure suggests that Transport's conduct was oppressive not only from the time the contract price was reached but from the time it received the initial estimate.

There is clear and convincing evidence that Transport engaged in oppressive conduct by refusing to settle a claim which in good faith it could not dispute and that it did so to further its own interests. Public policy would be served by the deterrent effect punitive damages would have upon such conduct. The award of punitive damages therefore is supported by sufficient evidence.

The trial court properly denied Transport's petition for declaratory judgment and refused its tendered instructions based upon the payment of loss, limit of liability and excessive repair time coverage provisions of the policy. The jury's compensatory and punitive damages verdicts are supported by sufficient evidence.

Affirmed.

CONOVER, P.J., and BUCHANAN, J., concur.