**Josephine SCHIMIZZI, M.D., Plaintiff,**

v.

**ILLINOIS FARMERS INSURANCE CO., Defendant.**

**No. 3:93–CV–173RM.**

United States District Court, N.D. Indiana, South Bend Division.

May 23, 1996.

Frederick R. Hovde, Townsend, Hovde and Montross, Indianapolis, IN, for plaintiff.

John P. McQuillan, Daniel A. Gioia, Theresa · L. Springmann, Ginamarie Gaudio–Graves, Spangler, Jennings and Dougherty, P.C., Merrillville, IN, for defendant.

## MEMORANDUM AND ORDER

MILLER, District Judge.

Following a nine-day trial on Dr. Josephine Schimizzi's complaint against Illinois Farmers Insurance Company for breach of contract and tortious breach of the insurer's duty to deal in good faith with its insured, a jury awarded Dr. Schimizzi $400,000 in compensatory damages and an additional $600,000 in punitive damages. Farmers now seeks judgment as a matter of law, amendment of the judgment, and/or a new trial. Dr. Schimizzi seeks amendment of the judgment to reflect prejudgment interest and seeks an award of attorney fees pursuant to Indiana's frivolous litigation statute.

For the reasons that follow, the court grants Farmers's motion to amend the judgment to the extent the verdict for $50,000 under the insurance policy's medical payments clause exceeds Dr. Schimizzi's properly compensable medical bills. The court also grants Dr. Schimizzi's motion for prejudgment interest because her damages under the uninsured motorist provision and part of her damages under the medical payments provision were fixed and ascertainable before trial. The court denies Dr. Schimizzi's motion for attorney fees because even if the Indiana fee statute applies in this federal action, Farmers's defense was not frivolous. The court also denies Farmers's motion for judgment as a matter of law on Dr. Schimizzi's tort claim and claim for punitive damages, because the evidence was sufficient to allow the jury to find that those claims were proven with respect to Farmers's failure to honor the medical payments provision of the insurance policy, though no tort was shown with respect to the uninsured motorist provision.

The court also, however, agrees that the jury's awards for emotional distress and punitive damages were excessive under the applicable federal standard, which requires the court to consider other awards of those kinds. The court grants Farmers's motion for a new trial on the issue of emotional distress damages, subject to Dr. Schimizzi's acceptance of a remittitur that would reduce her emotional distress award to $25,000, which still would be among this circuit's higher awards for emotional distress. Similarly, the court concludes that the punitive damages award, whether viewed in terms of its ratio to compensatory damages on the tort claim, or in terms of simple dollars, is vastly out of line with other awards of punitive damages for an insurer's breach of its duty of good faith under Indiana law, and excessive under all of the "guideposts" suggested by the United States Supreme Court. Accordingly, the court also grants Farmers's motion for new trial on the issue of the amount of punitive damages, subject to Dr. Schimizzi's acceptance of a remittitur that would reduce her punitive damages award to $135,000, which still would be the highest reported

punitive damages award against an insurer for Indiana's tort of breaching the duty to deal with the insured in good faith.

Finally, the court agrees with Dr. Schimizzi that she is entitled to prejudgment interest on her recoveries under the express policy provisions, but disagrees with her contention that she should be awarded attorney fees because Farmers's defense was frivolous.

## I. FACTS

Dr. Schimizzi is a licensed physician board-certified in family practice, a *magna cum laude* graduate of the University of Notre Dame, and a graduate of Indiana University School of Medicine. As of May 8, 1987, she was employed in two positions. She was working 30 hours per week at $35 per hour for a hospital-run urgent care facility known as MedPoint, and was serving as interim director of a hospital's Center for Occupational Health. She may have received an offer for full-time salaried employment with MedPoint shortly before the evening of May 8, 1987; the parties disputed this matter at trial. The court presumes the jury found in Dr. Schimizzi's favor on this issue, although it need not have done so to reach its verdict.

On the evening of May 8, 1987, Dr. Schimizzi was a passenger in a car that was driven by Richard LaSalvia. The car was insured by Illinois Farmers Insurance Company ("Farmers") under a policy issued to Mr. LaSalvia, and was struck from the rear by another vehicle. The drivers saw no damage to the LaSalvia vehicle and so parted without exchanging identification, but Dr. Schimizzi's neck soon began to hurt. The pain continued at least to the time of trial in March 1996. Dr. Schimizzi returned to work but found her hours curtailed by her pain. In May 1988, she stopped work altogether and has not worked as a physician since.

Dr. Schimizzi has proceeded on a long course of examinations by physicians, a string of various attorneys, and prolonged dealings with Farmers. The court need not address whether her claimed injuries and disability are real; the jury so found upon more than adequate evidence. There was more than ample evidence to support a finding of lost income and pain and suffering causally related to the collision to support a $250,000 (policy limits) finding for Dr. Schimizzi under the uninsured motorist clause of Mr. LaSalvia's Farmers policy, under which the parties agree Dr. Schimizzi is an insured. There also is more than ample evidence to support a finding of incurred medical expenses causally related to collision to support a finding for the plaintiff under the policy's medical payments clause. There are not enough medical expenses to support the jury's verdict for $50,000 under that clause; that issue is discussed in Part II of this opinion.

Mr. LaSalvia acted as Dr. Schimizzi's attorney in the weeks immediately after the collision, and submitted Dr. Schimizzi's claim to Farmers on May 28, 1987. Farmers mailed a medical payment claim form to Dr. Schimizzi for her signature the following day, but Dr. Schimizzi did not return the form. Farmers's medical claims payment supervisor may have mailed another copy of the medical payment claim form in June or July. If she did so, that form, too, was not returned, and Farmers did nothing further with respect to the form after that.

On June 4, 1987, Farmers told Dr. Schimizzi that her claim was not covered under the policy because it was not a traditional "hit and run". Five days later, Mr. LaSalvia presented a legal argument for coverage, and Farmers agreed to coverage in July, 1987. About that time, Farmers's liability claims manager expressed Farmers's first skepticism: "It is rather odd that a doctor, which our insured passenger is alleged to be, would not know she was hurt until after the insured was leaving the scene of an accident. I also think it is rather odd that our insured, as a practicing attorney, would react in such an unusual manner at the time of an accident. However, their actions are not beyond the relm [sic] of possibility. . . ." Farmers reserved $500 for the claim.

Mr. LaSalvia quit as Dr. Schimizzi's attorney, and John Hamilton took her case. On September 11, 1987, upon inquiry from Farmers, Mr. Hamilton reported that Dr. Schimizzi was not yet quiescent, and so declined to discuss resolution of the case.

By March 1988, Farmers was aware that Dr. Schimizzi had been working at least part-time at MedPoint, and Farmers's records showed a $5,000 settlement value of the claim. No offer was conveyed to Dr. Schimizzi, and Farmers had no contact with Mr. Hamilton from March to September 1988. Dr. Schimizzi, saddled with too much pain to perform her work, stopped all work at Med-Point in May 1988. Dr. Schimizzi has not worked as a physician since then. Some time around March 1989, Mr. Hamilton withdrew from representing Dr. Schimizzi, who retained attorney Dan Pfeifer. In June 1989, Farmers assigned its file to attorney Terrence Wozniak, who had been retained to represent Mr. LaSalvia in a different suit Dr. Schimizzi had filed through a different attorney. Mr. Wozniak originally took the position with Mr. Pfeifer that there was no coverage because this was not a "hit and run". Mr. Pfeifer sent Mr. Wozniak a copy of Farmers's earlier concession, which Farmers apparently had not provided to Mr. Wozniak.

On August 29, 1989, Mr. Pfeifer sent Farmers a demand for the policy limits, along with narrative records and medical reports which, according to Joseph Schaub (the person in charge of Farmers's local office), somehow got separated from the file. Mr. Pfeifer testified that as best he can recall, he included Dr. Schimizzi's medical bills with that letter, but the exhibits do not bear that out. Farmers did not respond to Mr. Pfeifer's demand for policy limits; on September 1, 1989, Mr. Schaub instructed Mr. Pfeifer to direct further correspondence to Mr. Wozniak. The medical records made their way to Mr. Wozniak; on September 8, 1989, he asked Mr. Pfeifer for better copies of Dr. Feferman's notes, and asked for the records of Drs. Ferlic and Mitros.

In October, 1989, Mr. Pfeifer demanded arbitration pursuant to a provision of the policy. After an initial period of uncertainty about a state judge's ethical ability to serve as an arbitrator, Mr. Pfeifer and Mr. Wozniak agreed on attorney James Olsen as an arbitrator, but that selection did not occur until August 1990. In December 1989, Farmers updated its reserve on Dr. Schimiz-

zi's claim to $3,000, but made no offer to Mr. Pfeifer or Dr. Schimizzi.

Discovery began in connection with the arbitration process. On December 11, 1989, Mr. Pfeifer served interrogatories on Farmers, with answers due January 15. On February 2, Mr. Pfeifer wrote Mr. Wozniak about the tardy answers, and Mr. Wozniak served Farmers's answers on February 9. Meanwhile, on January 19, 1990, Mr. Wozniak served interrogatories on Dr. Schimizzi by way of Mr. Pfeifer. Service of the interrogatories was repeated on March 2, 1990. On March 13, 1990, Mr. Pfeifer wrote Mr. Wozniak with a request that Farmers pay Dr. Schimizzi's medical bills.

On April 6, 1990, Mr. Pfeifer sent Mr. Wozniak a letter that claimed to enclose answers to interrogatories and copies of all medical records he had received from Dr. Schimizzi. Mr. Wozniak wrote back on May 3, 1990, confirming an earlier conversation that the interrogatory answers had not been enclosed, and further confirming Mr. Pfeifer's statement that the answers were being transcribed, but Mr. Wozniak still had not received the answers by May 3. In that May 3, 1990 letter, Mr. Wozniak enclosed medical authorization forms for Dr. Schimizzi's signature with respect to the treating doctors of whom Mr. Wozniak knew. Dr. Schimizzi testified at trial that she chose not to sign those authorizations because she believed the forms exceeded the proper scope of a medical authorization by, for example, allowing direct interviews with her health care providers.

On July 10, 1990, Mr. Wozniak received Dr. Schimizzi's unsigned answers to the interrogatories. On August 7, 1990, Mr. Wozniak asked again for signed interrogatory answers. In a postscript to a September 12, 1990 letter to Mr. Olsen concerning agreement on a September 21 scheduling conference, Mr. Pfeifer wrote to Mr. Wozniak, "Terry, hopefully by the time you receive this letter you will simultaneously have received the Answers to Interrogatories." The signed answers were not received.

On November 6, 1990, Mr. Wozniak sent Mr. Pfeifer authorization forms for Dr. Schimizzi's signature for eighteen health care providers (including Cleveland Clinic and

Johns Hopkins) along with five blank forms in case she had seen other doctors unknown to Mr. Wozniak. On November 28 and December 19, 1990, Mr. Wozniak sent additional letters to Mr. Pfeifer asking for signatures on the medical authorizations, and for signed interrogatory answers. On January 10, 1991, Mr. Wozniak wrote arbitrator Olsen asking for another meeting to discuss medical releases and signed interrogatories. On January 31, 1991, Mr. Pfeifer wrote Mr. Wozniak: "Relative to your request for Authorizations I would indicated [sic] that my client is reluctant to have Authorizations signed particularly in light of the recent decision of *Canfield v. Sandock.* Accordingly I would request that you utilize the Non–Party Request for Production of Documents requesting only medical records that are historically and causely [sic] related to the injuries claimed by Dr. Schimizzi in this accident."

*Canfield v. Sandock,* 563 N.E.2d 526 (Ind. 1990), was a decision issued by the Indiana Supreme Court in November 1990. The *Canfield* opinion reaffirmed Indiana's longstanding law that a patient waives her physician-patient privilege as to all matters historically or causally related to a physical or mental condition she has placed in issue by way of claim, counterclaim or defense. The *Canfield* opinion addressed the practical problem of screening medical records for information not historically or causally related to the condition at issue, which remain privileged. The supreme court held that when a patient's adversary serves a health care provider with a subpoena *duces tecum* that the patient believes may encompass privileged material, the patient should request a court to conduct an *in camera* review for redaction of privileged material. If Indiana courts allowed the *Canfield* procedures to be invoked when no suit is pending, an issue not raised at trial, the *Canfield* procedure might have allowed Farmers to obtain non-privileged records from Dr. Schimizzi's in-state health care providers but would provide no method of obtaining the records of health care providers not located in Indiana, such as Johns Hopkins, Rush–Presbyterian, Mayo Clinic, or the Cleveland Clinic, all of which had evaluated or treated Dr. Schimizzi.

In late January 1991, Mr. Wozniak, who found himself frustrated and beginning to take the case personally, asked Farmers to be relieved from the case. Farmers reassigned the file to attorney Arthur May and his law firm; because Mr. May was in Florida, responsibility within the firm devolved upon attorney Joseph Jensen. Around February 12, 1991, Mr. Jensen and Mr. May entered their appearance for Farmers in the arbitration proceeding, and Mr. Jensen asked for a continuance of the arbitration hearing set for March 20, 1991. On February 25, 1991, Mr. Jensen asked Mr. Pfeifer for records from the out-of-state health care providers (Rush Presbyterian, Cleveland Clinic, Johns Hopkins, and Mayo Clinic).

On February 27, 1991, Mr. Pfeifer wrote Mr. Jensen a letter asking when Dr. Schimizzi's medical bills would be paid. On March 15, 1991, Mr. Jensen sent Mr. Pfeifer another copy of the Farmers medical payment form, and reported that Farmers had not received any medical bills, or the signed form.

Meanwhile, on March 1, 1991, Mr. Jensen obtained subpoenas from the St. Joseph Circuit Court for eighteen Indiana health care providers. Those subpoenas were not served. Mr. Jensen recalls he did not serve the subpoenas because Mr. Pfeifer indicated it wasn't necessary to use them. Mr. Pfeifer's memory differs; he believes he would not have made such a statement in light of the position taken in his *Canfield v. Sandock* letter. Given the standards applicable at this post-verdict stage, the court accepts Mr. Pfeifer's testimony, leaving Mr. Jensen's failure to serve the subpoenas unexplained.

Mr. Jensen tried another approach: on March 11, 1991, he sent Mr. Pfeifer twenty-one medical authorization forms for Dr. Schimizzi's signature and assured Mr. Pfeifer in writing that only Farmers's counsel, Farmers's adjuster, and the eventual independent medical examiner would review the records. On April 22, 1991, Mr. Pfeifer reported to arbitrator Olsen and Mr. Jensen that Dr. Schimizzi had retained other counsel, and asked that the arbitration be held in abeyance until new counsel entered an appearance.

On May 30, 1991, Mr. Jensen moved to dismiss the arbitration for lack of cooperation. Mr. Jensen sent the motion to Mr. Pfeifer since he did not know who was then representing Dr. Schimizzi. A June 10, 1991 letter from Mr. Jensen acknowledged a phone call from Louisville, Kentucky, attorney Roya Ghazi saying that she was representing Dr. Schimizzi. In that letter, Mr. Jensen informed Ms. Ghazi of the pending dismissal motion, assured non-disclosure of any medical records, and asked for medical records from twenty-one health care providers (including Rush Presbyterian, Cleveland Clinic, Johns Hopkins).

On June 18, 1991, Dr. Schimizzi signed her answers to Farmers's interrogatories. The answers identified $11,752 in medical expenses, but that sum included $554 in travel expense to Cleveland Clinic. Dr. Schimizzi's answers claimed $382,432 in lost wages. On June 24, 1991, Ms. Ghazi sent receipts totaling about $9,000 to Farmers. Farmers claims to have misfiled the receipts. On July 22, 1991, Mr. Jensen wrote Ms. Ghazi saying that all he had received was medical bills, not medical records. He again asked for signed medical authorization forms, and said that without them, "I see no way this arbitration case can proceed to hearing." On August 1, 1991, Ms. Ghazi wrote Mr. Jensen: "Enclosed please find medical records".

On March 2, 1992 Dr. Schimizzi was awarded social security disability. Also in March 1992, attorney Richard Heideman (who was representing Dr. Schimizzi with Ms. Ghazi) failed to appear for Dr. Schimizzi's deposition. Mr. Jensen sought, and arbitrator Olsen eventually awarded, sanctions for that failure. The sanctions award was never paid.

In May 1992, Farmers conducted what it describes as a "neighborhood canvas", in which Dr. Schimizzi's neighbors and acquaintances were asked about her. On May 15, 1992, Mr. Jensen wrote Ms. Ghazi, saying Ms. Ghazi's file of medical records appeared to be incomplete. He sent medical authorization forms for Dr. Schimizzi's signature concerning Doctors Ferlic, Stecker, Josephson, Kempf and Edwards. Mr. Jensen's letter also reported that Farmers was inclined to make a settlement offer, but would not do so until Farmers received the requested medical records. In June, 1992, Farmers increased its reserve on Dr. Schimizzi's claim to $30,000 based on her interrogatory responses.

On June 18, 1992, attorney Marcel Katz (who was serving as Indiana counsel with Ms. Ghazi of Louisville) wrote to Mr. Jensen, confirming a discussion about the procedure under which Mr. Jensen would send Mr. Katz the medical records Mr. Jensen had; Mr. Katz would compare those records with his own file, and send Mr. Jensen what Mr. Jensen was missing. Mr. Katz's letter also confirmed a discussion he and Mr. Jensen had about Dr. Schimizzi's medical bills, in which Mr. Jensen was said to have agreed to urge Farmers to pay the medical claims. Mr. Jensen responded in a letter dated June 25, 1992, in which Mr. Jensen disputed having agreed to urge payment by Farmers, and said he only agreed to ask why the bills were not paid and to tell Mr. Katz what more was needed for payment. Mr. Jensen sent Mr. Katz an itemization of the records in Mr. Jensen's possession.

In July 1992, Mr. Jensen told arbitrator Olson that thirty days more were needed for depositions, after which the case would be ready for arbitration. On inquiry from Mr. Jensen, Farmers discovered the receipts Ms. Ghazi had sent in June 1991—thirteen months earlier. Mr. Schaub gave the bills to medical claims processor Kathy Murphy, who decided $2,928.92 could be paid based on the available documentation, but that more information was needed as to the rest. On July 29, 1992, Ms. Murphy sent the check and her inquiries to the Heideman law firm where Ms. Ghazi worked in June 1991, but no longer worked in July 1992. Mr. Heideman still represented Dr. Schimizzi at that point,[1] but

---

1. In her response to Farmers's post-trial motions, Dr. Schimizzi states that the Heideman firm was no longer representing her when the check was sent. The record does not support this assertion; Mr. Katz's August 6 letter to Mr.

Jensen indicates that the Heideman firm was still on the case. The court attributes no intentional misrepresentation on this point to Dr. Schimizzi; she has had many attorneys at various times.

the record contains no further correspondence about the check or Ms. Murphy's inquiries.

On August 6, 1992, Mr. Katz wrote Mr. Jensen, saying he had forwarded the inventory to Mr. Heideman, but could not tell from the inventory what records Mr. Jensen had. Mr. Katz asked Mr. Jensen to copy all the discovery Mr. Jensen had received about the medical bills and records from Dr. Schimizzi's attorneys and send it for comparison.

A September 18, 1992 letter from Mr. Jensen to Mr. Heideman "confirmed" new deposition dates and the consequent rescheduling, from November 2 to February 2, of the deadline for submitting the prehearing order to arbitrator Olson. In a September 28, 1992 letter, Mr. Jensen told Mr. Heideman that the rescheduling of depositions to accommodate Mr. Heideman's schedule caused a three-month delay in the arbitration, and also inquired about the $264 in sanctions the arbitrator had ordered earlier. In a letter of October 5, 1992, Mr. Heideman said the three-month delay was due to Mr. Jensen's having selected the deposition dates unilaterally.

Attorney Anthony Iemma, eventually joined by attorney Joseph Simeri, replaced Mr. Heideman as Dr. Schimizzi's counsel. After a deposition, Mr. Iemma told Mr. Jensen he believed it had been bad faith for Farmers not to have paid policy limits. On November 25, 1992, Mr. Katz formally withdrew his appearance for Dr. Schimizzi in the arbitration proceeding.

On October 22, 1992, Farmers "closed" the medical payments file concerning Dr. Schimizzi. According to Farmers's regional liability claims director James Winter, it was unreasonable to close a medical payments file with knowledge that bills were pending.

Arbitrator Olson held a status hearing on November 11, 1992, and scheduled the arbitration for February 10, 1993, with exhibits to be submitted by January 15 and a final pre-hearing conference to be held on February 1. The attorneys agreed that the only issue for determination would be the amount of damages. On November 13, 1992, Mr. Jensen served interrogatories and request for production of documents on Mr. Simeri and Mr. Iemma. The interrogatories sought identification of all health care providers; the document request sought all medical records and reports from the providers identified in the interrogatories.

On January 11, 1993, Mr. Simeri sent responses to interrogatories and document production request to Mr. Jensen. A week later, Farmers served its own answers to Dr. Schimizzi's interrogatories, saying that Farmers received unsigned answers to their first set of interrogatories on September 12, 1990, and did not get signed copy until July 10, 1991.

In January 1993, Farmers increased its reserve on Dr. Schimizzi's claim to $250,000, and Mr. Jensen recommended that Farmers settle the uninsured motorist claim for the policy limits, or $250,000. Based on that recommendation, Mr. Schaub wrote a memorandum to Farmers's Columbus, Ohio office on January 20, 1993, recommending settlement for policy limits. Mr. James Winter wrote a blistering memorandum in response, saying the investigation had been inadequate, that the local office should get an independent medical examination and Dr. Schimizzi's tax records, should make a demand for medical authorizations supported by the policy provision requiring such authorizations, and investigate whether Dr. Schimizzi actually had (as she reported) purchased a house for a private medical practice shortly before the auto accident.

On February 1, 1993, in response to the Winter memo, Mr. Jensen told arbitrator Olson he wanted to take "a couple of" depositions, and Mr. Olson continued the arbitration for thirty days. On February 2, 1993, Mr. Jensen informed Mr. Simeri in a letter that Farmers wanted an independent medical examination, medical authorizations signed by Dr. Schimizzi, and more wage information. In this letter, Mr. Jensen cited, for the first time, the policy clause requiring Dr. Schimizzi's cooperation and signature on medical authorizations, as a condition of coverage.

In March 1993, Kathy Murphy learned that the check she had sent to Ms. Ghazi in July 1992 had been "stale dated," meaning

that it remained uncashed for 6 months after issuance. She asked Mr. Schaub what she should do, and he told her to "wait until we hear from them", and so she did nothing.

On March 12, 1993, Dr. Schimizzi filed her complaint in this court, invoking the court's diversity jurisdiction over her claims which, by the time of trial, were four: a breach of the insurance policy's uninsured benefits provision; a breach of the policy's medical expenses provision; a claim sounding in tort for bad faith in the handling of her claim; and a claim for punitive damages based on the bad faith claim. Farmers denied liability on each of the claims. The jury decided against Farmers across the board. On the claim that Farmers breached the uninsured motorist clause, the jury awarded Dr. Schimizzi the policy limit of $250,000. On the claim that Farmers breached the medical expenses clause, the jury awarded Dr. Schimizzi the policy limit of $50,000. On the bad faith claim, the jury awarded Dr. Schimizzi $100,000 in additional damages for emotional distress, and further awarded punitive damages in the sum of $600,000. The verdict totaled $1 million.

## II. CHALLENGES TO THE VERDICT

Farmers reasonably does not challenge the $250,000 award for breach of the uninsured motorist benefits clause: although the issue was hotly contested at trial, there was ample evidence from which the jury could have found that Dr. Schimizzi's injuries from the accident render her disabled, and her wage loss alone within the five years to which the policy looks after the accident easily exceeded that policy limit. For her part, Dr. Schimizzi does not dispute Farmers's contention that the jury was impermissibly generous in its award for breach of the medical expenses clause: Dr. Schimizzi's medical bills (as distinct from travel and lodging in the course of obtaining medical treatment, which the clause does not cover) total only $19,432.27, considerably short of the jury's award of policy limits. Thus, the parties agree the jury's verdict must be reduced by $30,567.73; since Farmers's motion to alter and amend the judgment pursuant to Federal Rule of

Civil Procedure 59(e) seeks nothing more, that motion must be granted.

Farmers contends that no reasonable jury could find that it breached its obligation of good faith dealing, or that Dr. Schimizzi suffered any compensable damages by reason of such a breach, or that punitive damages were permissible under the evidence. Accordingly, Farmers asks the court for judgment as a matter of law with respect to those claims, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, or alternatively, for a new trial as to those claims pursuant to Rule 59(a) of the Federal Rules of Civil Procedure.

 The federal standard, rather than Indiana law, governs the motion for judgment as a matter of law. *Mayer v. Gary Partners and Co., Ltd.*, 29 F.3d 330, 335 (7th Cir.1994). The court inquires whether, making all reasonable inferences from the evidence and examining it in the light most favorable to Dr. Schimizzi as the prevailing party, the evidence supports a finding on each element of the claim. *Hutchison v. Amateur Elect. Supply, Inc.*, 42 F.3d 1037, 1042 (7th Cir.1994).

### A. Governing Indiana Law: The Insurer's Tort

The legal theory underlying Dr. Schimizzi's claims is still evolving in Indiana law, which provides the rule of decision in this diversity case. Indiana long recognized the recoverability of punitive damages for abusive conduct by insurers, but the rationale for such an award has changed significantly in recent years. In *Vernon Fire & Cas. Ins. Co. v. Sharp*, 264 Ind. 599, 349 N.E.2d 173, 180–181 (1976), the Indiana Supreme Court held that punitive damages could be awarded for breach of an insurance contract when elements of tort (such as fraud, malice, gross negligence, or oppression) mingled with the breach. Because of this remedy's adequacy, Indiana courts declined for years to recognize an independent tort of bad faith dealing by an insurer. *See, e.g., Liberty Mut. Ins. Co. v. Parkinson*, 487 N.E.2d 162, 165 (Ind. Ct.App.1985). In *Miller Brewing Co. v. Best Beers of Bloomington, Inc.*, 608 N.E.2d 975 (Ind.1993), the supreme court reviewed *Vernon* and its progeny, and found that in every

case (including *Vernon*) in which punitive damages had been awarded as part of a contractual case, the court had found evidence of an independent tort. Thus, the court concluded, the concept in *Vernon* of elements of tort mingling in the controversy was merely dictum, and an independent tort must be shown to remove a case from the uniformly applicable rule that punitive damages are not available in an action for breach of contract. 608 N.E.2d at 984 ("We hold that in order to recover punitive damages in a lawsuit founded upon a breach of contract, the plaintiff must plead and prove the existence of an independent tort of the kind for which Indiana law recognizes that punitive damages may be awarded.").

Because Indiana theretofore had refused to create an independent "bad faith dealing" tort, the *Miller Brewing* holding left insureds without a route to punitive damages, but only temporarily so. Nine months after *Miller Brewing*, in *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515 (Ind.1993), the supreme court concluded that "recognition of a cause of action for the tortious breach of an insurer's duty to deal with its insured in good faith is appropriate", 622 N.E.2d at 519, but the court refrained from any attempt to define the tort fully, other than stating that the insurer's duty of good faith dealing included the "obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim." *Id.* The court further explained that neither a ˙good faith dispute over the validity or amount of a claim nor a lack of a diligent investigation is a breach of the duty of good faith dealing, but knowingly denying a claim without a rational, principled basis for doing so is a breach. *Id.* at 520. The court also declined to define the nature and extent of damages recoverable for a breach of the duty of good faith dealing, other than to note that the tort damages will be coterminous with

the damages for breach of the contract in most cases. *Id.* at 519.

The *Erie* court also stated that a mere showing of the new tort does not justify an award of punitive damages; as in other settings, "[p]unitive damages may be awarded only if there is clear and convincing evidence that the defendant 'acted with malice, fraud, gross negligence, or oppressiveness which was not the result of mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing....'" 622 N.E.2d at 520.

■ In a diversity case, the court is to apply the law as interpreted by the highest court of the state whose law provides the rule of decision, *Doe v. Roe No. 1*, 52 F.3d 151, 154 (7th Cir.1995), but the Indiana Supreme Court has provided no further definition of the tortious breach of the insurer's obligation to deal in good faith with its insured. As discussed below, the Seventh Circuit and the Indiana Court of Appeals have decided a few cases under *Erie*, but due to the vast procedural and factual differences between those cases and this one, those decisions provide precious little guidance.

The court turns first to the Indiana Court of Appeals' post-*Erie* cases. In *Nelson v. Jimison*, 634 N.E.2d 509, 512–513 (Ind.Ct. App.1994), summary judgment for the insurer was held inappropriate when the insurer ultimately conceded that the insured was entitled to policy limits and paid that sum nearly five years after the accident, the insured's attorney had made repeated efforts to obtain earlier payment, the insurer had lost key documents, and the insured offered two experts' opinions that no reasonable basis existed to dispute the claim and delay payment. The insurer's claim of good faith, the *Nelson* court held, was a matter for determination by a trier of fact, not a summary judgment court. This case, of course, is not before the court on a summary judgment motion.[2] In *Guarantee Trust Life Ins.*

---

**2.** *Economy Fire & Cas. Co. v. Collins*, 643 N.E.2d 382 (Ind.Ct.App.1994), was another summary judgment case. The *Economy Fire* court held simply that an insured may sue an insurer whose bad faith conduct has resulted in a judgment

against the insured in excess of policy limits, even if the insured has not paid all or any of the judgment. The court based its decision in part on the public policy evidenced by *Erie*, but did not further refine the new tort recognized in

*Co. v. Palsce,* 641 N.E.2d 1266 (Ind.Ct.App. 1994), the court cited *Erie* extensively while upholding awards of compensatory and punitive damages against an insurer, but the awards were based on a theory of fraud arising from statements in the insurer's brochure, not on the breach of the insurer's obligation of good faith.

In *Dimitroff v. State Farm Mut. Auto. Ins. Co.,* 647 N.E.2d 339, 341 (Ind.Ct.App. 1995), the court of appeals held that an insurer owes no duty of good faith dealing to a plaintiff suing its insured. As a passenger in the LaSalvia vehicle, however, Dr. Schimizzi was an insured under the Farmers policy, not a plaintiff suing Mr. LaSalvia. Finally, in *Sell v. United Farm Bureau Family Life Ins. Co.,* 647 N.E.2d 1129, 1134 (Ind.Ct.App. 1995), the court of appeals held that an insurer did not breach its *Erie* duty when it declined the insured's request to pursue a course of action not required by the policy.

The Seventh Circuit reviewed a punitive damages award against an insurer in *McLaughlin v. State Farm Mut. Auto. Ins. Co.,* 30 F.3d 861 (7th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1098, 130 L.Ed.2d 1066 (1995). *Erie* was decided during the pendency of the appeal, and the jury instructions had not anticipated the creation of a new tort; because the instructions were erroneous in the wake of *Erie,* the judgment was reversed. The court went on to conclude that the evidence was not sufficient to warrant punitive damages on a bad faith claim: when it denied the insured's fire loss claim, the insurer knew the circumstances surrounding the fire were suspicious, that the insured was behind in payments on several debts and had lied to the insurer about his sources of income, that the insured had made two prior fire loss claims, and that the in-

sured had given varying details in his statement of his whereabouts at the time of the fire. In light of this evidence, the Seventh Circuit held, there was no basis for punitive damages, although the jury could "have found that the denial of coverage was unreasonable and therefore tortious or, in any event, a breach of contract." 30 F.3d at 870. Accordingly, the court upheld the judgment to the extent the insured was awarded compensatory damages under the policy, but reversed the punitive damages award.

In *Donald v. Liberty Mut. Ins. Co.,* 18 F.3d 474 (7th Cir.1994), a summary judgment case, the insurer conditioned payment to a third-party beneficiary[3] under a medical payment provision on the insured's execution of a release with respect to the insured's further liability. The Seventh Circuit first concluded that the plaintiff was entitled to recover under the medical payment provision, and then turned to the bad faith claim on which the plaintiff's punitive damages claim relied, and concluded that the plaintiff had come forward with sufficient evidence to survive summary judgment on that claim:

In this case Donald argues, first, that Liberty Mutual's refusal to pay him policy proceeds was unfounded and second, that by requiring him to release the University from all liability before Liberty Mutual would forward the $5,000 medical payment benefits, it exercised an unfair advantage to pressure him into settlement of his claim. This appears to fall within the broad description of tort provided by the Indiana Supreme Court. Hence if Donald can prove by a preponderance of the evidence either that Liberty Mutual's refusal to pay the medical payment benefits was unfounded, or that it acted improperly by requiring him to release the University

---

*Erie,* an issue simply not before the court of appeals.

**3.** The *Donald* court, acting in 1994, did not have the benefit of the decision noted above in *Dimitroff v. State Farm Mut. Auto. Ins. Co.,* 647 N.E.2d 339, 341 (Ind.Ct.App.1995), which may be inconsistent with the holding in *Donald* that a third-party beneficiary—there, a person injured on the insured's property—may bring a bad faith claim against the insurer. *See Donald,* 18 F.3d at 483 ("Although Donald is not an insured but is

rather a third party beneficiary of one of the provisions in the contract of insurance, the same factors that militated in favor of recognizing a duty of good faith and fair dealing between the insurer and its insured in *Hickman* persuade us that Indiana would impose the same duty upon an insurer and a third party beneficiary of the insurance policy."). Because Dr. Schimizzi was an "insured" under the Farmers policy, further comment is unnecessary to decide this case's issues.

from liability before it would pay the medical payment benefits, Donald will have demonstrated that Liberty Mutual committed the tort of bad faith dealings by an insurer.

18 F.3d at 484 (citation omitted). The court further held that same evidence could be found to be oppressive conduct warranting an award of punitive damages.

In accordance with this case law, the court instructed Dr. Schimizzi's jury as follows:

I turn now to the plaintiff's second claim, in which she contends that the defendant breached its obligation of good faith and fair dealing. In every insurance policy there is a legal duty owed by the insurance company to the insured based upon the implied obligation of good faith and fair dealing with respect to the discharge of the insurer's contractual obligation includes the obligation to refrain from making an unfounded refusal to pay policy proceeds.

Insurance companies may, in good faith, dispute claims. The making of an error of judgment, or even a negligent mistake, as to whether or not a claim is payable, or the extent of proper payment on a claim, is not a breach of the obligation to exercise good faith. Similarly, the lack of a diligent investigation on the part of the insurance company, is not alone a breach of the obligation to exercise good faith.

Court's Final Instruction No. 15.

### B. Sufficiency of Evidence: Breach of Duty of Good Faith

Dr. Schimizzi's response to Farmers's motions does not separately address the evidence establishing the tortious breach of the duty to deal with an insured in good faith; the court presumes her recitation of the facts supporting the punitive damages claim encompass the facts supporting the bad faith claim. She sets forth the following:

1. Farmers wrongly denied her claim in May 1987 because it misread the policy and didn't reverse its position until Mr. LaSalvia persuaded them in July 1987. This misrepresentation of coverage (viewing it in its most sinister light) did not delay the handling of Dr. Schimizzi's claims; Mr. Hamilton reported months later that the claims were not ready for submission.

2. Mr. Wozniak repeated the misreading of the policy in 1989 and had to be persuaded by Mr. Pfeifer that coverage existed. This statement did not delay the claims' resolution; the demand for arbitration was unrelated, and the arbitrator was not selected until several months later.

3. Mr. Wozniak took the position that Dr. Schimizzi's suits against Mr. LaSalvia would have to be dismissed before arbitration of the uninsured motorist claim. Mr. Pfeifer testified that at some point, Mr. Wozniak asked whether Dr. Schimizzi wanted to pursue her uninsured motorist claim (which Mr. Pfeifer was handling) or her claim against Mr. LaSalvia (which Mr. Bremer was handling), and that he would act once that decision was made; Mr. Pfeifer testified that he made clear that he was pursuing arbitration on the uninsured motorist claim. It does not appear that Mr. Wozniak's statement actually delayed the arbitration process or the handling of the medical bills.

4. Farmers took the position that the time limit for payment of medical bills under the medical payments provision was two years. There is, however, no evidence that any medical payments were withheld on this ground.

5. Mr. Pfeifer made written demand for payment under the medical payments provision in March 1990, and by June 24, 1991, Farmers had all of the medical bills they eventually agreed to have submitted into evidence at the arbitration hearing. Nonetheless, Farmers did nothing with the bills under July 1992, when a check was issued for part of the claim and sent to an attorney no longer at that address. This contention is discussed in greater detail below.

6. Although Farmers's policy manual required that cases such as Dr. Schimizzi's be handled either by securing an examination of the insured or having attending medical reports reviewed by a Farmers

compensation examiner, this was never done.

7. Farmers closed its medical payments file without further action in October 1992, and since (as they had reason to know) Dr. Schimizzi never received the modest check issued in July 1992, Farmers has never paid any of Dr. Schimizzi's medical bills. This contention is discussed in greater detail below.

8. Farmers never had a rational, principled basis for denying Dr. Schimizzi's claim.

9. Mr. Jensen failed to subpoena Dr. Schimizzi's medical records despite knowing she would not provide signed medical authorizations.

10. On the eve of the scheduled arbitration, nearly six years after the accident occurred, Farmers triggered a series of demands for further information rather than settle the case in accordance with advice from its attorney and Mr. Schaub.

■ Dr. Schimizzi complains of Farmers's own conduct as well as action and inaction by Farmers's attorneys. The court agrees with Dr. Schimizzi that Farmers would be liable for its attorneys' tortious acts, *see United Farm Bur. Mut. Ins. Co. v. Groen,* 486 N.E.2d 571, 574 (Ind.Ct.App.1985), but disagrees that anything done by Mr. Wozniak or Mr. Jensen would amount to a breach of the insurer's obligation of good faith dealing.

### 1. The Handling of the Uninsured Motorist Claim

■ To the extent Dr. Schimizzi contends that Farmers's attorneys took too long to abandon cooperative discovery efforts in favor of more aggressive treatment such as subpoenas and express invocation of the policy provision requiring an insured to sign medical authorization, she essentially asserts something of a reverse malpractice claim that Farmers's attorneys had a duty to fight her harder during the arbitration. This contention confuses Farmers's obligation to Dr. Schimizzi with the attorneys' obligation to Farmers. Farmers had a duty to deal with Dr. Schimizzi in good faith, regardless of whether it was dealing directly with Dr. Schimizzi or acting through its attorneys, and

Farmers's attorneys owed Farmers a duty of vigorous representation within the Rules of Professional Conduct, but neither Farmers nor its attorneys owed Dr. Schimizzi a duty to treat her more harshly. It cannot be a breach of good faith and fair dealing not to lean harder on an uncooperative insured.

The evidence adduced at trial points unerringly to the conclusion that any failure of Mr. Wozniak and Mr. Jensen to complete their investigation was due, ultimately, to Dr. Schimizzi's dogged refusal to provide information. It is true that Farmers had no more information about Dr. Schimizzi's injuries and causation by February 1993, when the arbitration was scheduled, than it had as of June 24, 1991, and that if causation (which no information then in Farmers's file disproved) were assumed, Dr. Schimizzi's wage loss alone exceeded the limits of the uninsured motorist coverage. But the lack of additional information ultimately is attributable to Dr. Schimizzi. *Canfield v. Sandock* provides no justification for her refusal to execute authorizations tendered to her from May 1987 until the *Canfield* decision in November 1990. After *Canfield* was decided, the new process provided Mr. Wozniak and Mr. Jensen with only partial assistance. Indiana courts would have no jurisdiction over out-of-state providers such as Rush–Presbyterian, Johns Hopkins, Cleveland Clinic, and Mayo Clinic. For that matter, neither the evidentiary record nor any case law cited by the parties answers whether Indiana trial courts make *Canfield*-type reviews of medical records not pertaining to pending cases, or whether arbitrators are authorized to make *Canfield*-type reviews. Nothing in the insurance policy required Farmers to subpoena Dr. Schimizzi's medical records. *See Sell v. United Farm Bureau Family Life Ins. Co.,* 647 N.E.2d 1129, 1134 (Ind.Ct.App.1995).

Still, despite explicit offers from Mr. Jensen to limit dissemination of information received from health care providers, Dr. Schimizzi steadfastly refused to provide medical authorizations from May 1987 into February 1993, when Mr. Jensen finally, at Mr. Winter's insistence, cited the policy's cooperation/authorization clause and demanded an independent medical examination and tax in-

formation. In contending that Farmers should have served its subpoenas on her health care providers, Dr. Schimizzi seems to concede that it was reasonable for Farmers to want to see her full set of records pertaining to her claimed injuries (and not just the records Dr. Schimizzi had forwarded). That is what Farmers finally chose to do in January 1993.

■ Neither Mr. Wozniak nor Mr. Jensen ever withheld information or dealt unreasonably with Dr. Schimizzi or her counsel. At worst, Mr. Jensen showed excessive patience with Dr. Schimizzi when he told arbitrator Olsen that Farmers was ready for arbitration while his requests to Mr. Simeri for medical authorizations still were outstanding. Excessive patience with an insured in awaiting compliance with reasonable requests cannot be a breach of the obligation of good faith and fair dealing. Nothing in Indiana law supports the proposition that forbearance from use of a contractual remedy to require an insured to do what she does not want to do, while trying to work with the insured's counsel to acquire information in an agreeable way, is a breach of the obligation of good faith and fair dealing. An insured has no contractual right for the insurer to press her harder or earlier than she wishes.

■ Conversely, there was no breach of the obligation of good faith and fair dealing when Farmers decided to invoke its policy rights before arbitration after nearly six years of trying to accommodate Dr. Schimizzi's concerns about medical authorizations. Mr. Simeri's perception that this was a bad faith effort to avoid arbitration is understandable in light of the sequence of events he perceived: Mr. Jensen indicated preparedness, then asked for thirty days to take a couple of depositions, then invoked the policy to demand that Dr. Schimizzi do what she had declined to do for nearly six years. But it was no breach of the obligation of good faith to wait until January 20, 1993 to seek authority for a policy limits settlement in light of the ongoing efforts to obtain the medical authorizations. If, as concluded above, it is no breach of the insurer's obligation to give the insured an opportunity to provide information on mutually agreeable

terms rather than under compulsion of a policy term, it cannot be a breach of the insurer's obligation to give the insured until the last minute until finally evaluating the claim, or finally to insist on the insured's cooperation pursuant to the policy.

Accordingly, no reasonable jury could find on this record that Farmers breached its duty of fair dealing in its handling of the uninsured motorist claim, because this evidence is insufficient as a matter of law. This jury may not have made such a finding, because the record amply supports a finding that Farmers's handling of the medical bills under the medical payments clause constituted a violation of the obligation of good faith and fair dealing.

### 2. The Handling of the Medical Payments Claim

■ Farmers received at least some medical bills no later than June 24, 1991 from Ms. Ghazi (and perhaps as early as August 29, 1989 if the jury credited Mr. Pfeifer's memory, despite its lack of support in the exhibits). Farmers claimed to have misplaced the bills. Mere negligence is not a breach of the obligation of good faith, but the jury was not required to accept Farmers's explanation, particularly in light of the conduct that followed.

Mr. Katz asked again about the medical bills on June 18, 1992; Mr. Schaub did not give the bills to Ms. Murphy until on or about July 29, 1992. The record contains no explanation for this six-week delay. Ms. Murphy responded to the bills with partial payment and requests for more information. Under other circumstances, there might have been nothing unreasonable about some of Ms. Murphy's requests for further information with respect to some of the bills (such as the undocumented prescription receipts), and the denial of travel expenses was reasonable. If, however, Farmers had possession of the bills since at least June 1991, and perhaps since August 1989 (crediting Mr. Pfeifer's recollection), a reasonable jury could consider it oppressive to demand greater specificity thirteen to thirty-five months after the bills were received, years more after the receipt was acquired. Further, the medical records

already in Farmers's possession were sufficient to explain some of Ms. Murphy's questions. For example, she inquired why four cervical collars were necessary; the medical records already provided to Farmers, while incomplete, provided ample explanation.

■ The jury could not find Farmers to have acted in bad faith in sending the inquiries to Ms. Ghazi at the Heideman law office. The record contains nothing to suggest Farmers knew that Ms. Ghazi no longer was Dr. Schimizzi's attorney, and Mr. Heideman continued to act on Dr. Schimizzi's behalf into August 1992. Farmers offered no explanation, however, for sending the check to Ms. Ghazi rather than to Dr. Schimizzi personally after Mr. Katz asked that the check be sent to Dr. Schimizzi because she had paid the bills. Since Mr. Heideman continued to represent Dr. Schimizzi at the time, that decision cannot be said to be the cause of Dr. Schimizzi not receiving the check, but it is evidence the jury could have found to be corroborative of gross negligence.

According to the unrebutted testimony of even Mr. Winter, it was unreasonable to close the file in October 1992, while the request for information about the rest of the medical bills was pending. The evidence does not suggest that the file's closing harmed Dr. Schimizzi in any sense, but again, it is evidence the jury could have found to be corroborative of gross negligence.

The jury was not required to find that the March 1993 decision to keep the file closed and take no action upon discovery that the $2,900 benefits check had not been cashed (other than to stop payment on the check) was mere negligence or human error in judgment. Upon learning that the check had not been cased at least a year and a half after the bills had been submitted, a reasonable jury could have found that had Farmers been acting in good faith, it would have inquired why Dr. Schimizzi had not received the money Farmers had decided she was entitled to get. The jury reasonably could find that under its obligation to Dr. Schimizzi of fair

dealing, Farmers, which already had been asked repeatedly to pay the medical bills, should have looked into the check's fate without awaiting still another request for payment.

Farmers never contested its obligation to pay Dr. Schimizzi's medical bills under the policy's medical payments provision until suit was filed. Farmers argued at trial that causation still remained a requirement even under that provision, but no such objection was raised before this suit was filed. The jury easily could have found that this was not a good faith dispute over liability; at least nobody responded to Dr. Schimizzi's attorneys' requests for payments by saying it was. The jury reasonably could find that despite the lack of objection, Farmers handled Dr. Schimizzi's medical bills initially in a cavalier fashion, eventually burying its questions about the bills and the check for a fraction of the bills pending another inquiry from Dr. Schimizzi, years after the bills' submission, and many years after the accident and the provision of the medical services. Farmers never articulated a principled, rational basis for not paying Dr. Schimizzi's medical bills before this suit was filed. The jury was entitled to find that this conduct constituted a breach of Farmers's obligation to deal in good faith with its insured.

### C. Excessiveness of Damages for Emotional Distress

■ The holding that sufficient evidence supports the jury's finding of tortious conduct by Farmers, coupled with the jury's unchallenged modified finding that Farmers is liable to Dr. Schimizzi for $19,432.27 under the medical payments provision, suffices to establish that Dr. Schimizzi is entitled to compensatory damages for breach of the duty of good faith bargaining,[4] but she is not entitled to recover the policy proceeds twice. *See Erie Ins. Co. v. Hickman by Smith,* 622 N.E.2d 515, 519 (Ind.1993) ("Neither do we need to decide the precise nature and extent of damages recoverable in such an action.... Nonetheless, in most instances, tort damages

---

4. Accordingly, even if Dr. Schimizzi were not entitled to further compensatory damages for Farmers's tort, sufficient compensatory damages

would exist to allow her to seek an award of punitive damages.

for the breach of the duty to exercise good faith will likely be coterminous with those recoverable in a breach of contract action."). At trial, the court held that Dr. Schimizzi could recover damages for emotional distress if the jury found that the tort was intentional, *see Cullison v. Medley,* 570 N.E.2d 27 (Ind.1991); *see also Shuamber v. Henderson,* 579 N.E.2d 452, 455 (Ind.1991) (describing *Cullison* as holding that "where intentional torts are concerned, recovery for emotional distress is now permitted if the tort is one which would foreseeably provoke an emotional disturbance of the kind normally to be aroused in the mind of a reasonable person"), and so instructed the jury, over Farmers's objection, as follows:

> If you find that the defendant breached its covenant of good faith and fair dealing owed to the plaintiff in this case, you may award compensatory damages to the plaintiff for the following items:
>
> 1. All benefits under the policy that the plaintiff has shown were proximately caused by the May 8, 1987 accident;
>
> 2. All mental and emotional distress caused by the defendant's breach of its covenant of good faith and fair dealing, if you find that the breach was done for the purpose of causing the injury or with knowledge that the injury was substantially certain to follow.

Final Instruction No. 16. Under this instruction, the jury returned emotional distress damages in the sum of $100,000. Ample evidence, set forth in the preceding section, supports a finding that the tort was intentional,[5] but the court agrees with Farmers that the $100,000 damage award cannot stand when viewed in the context of a breach of the duty to deal in good faith with respect to the medical payments provision of the policy.

■ Indiana law governs the measure of recoverable damages. Under Indiana law, " '[i]n tort, all damages directly traceable to

the wrong and arising without an intervening agency are recoverable.' When the tortious acts of appellant created the situation, 'all doubts and uncertainties as to the proof of the exact measure of damages must be resolved against it' because '[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of uncertainty which his own wrongdoing has created.'" *Eden United, Inc. v. Short,* 653 N.E.2d 126, 130–131 (Ind.Ct.App.1995). Even when state law provides the rule of decision in a diversity case, the Seventh Amendment's application requires a federal court to apply federal standards concerning excessiveness of damages. *In the Matter of Innovative Const. Systems, Inc.,* 793 F.2d 875, 877–888 (7th Cir.1986). Under that standard, a jury award may be found impermissibly excessive only if the award is monstrously excessive, a product of passion and prejudice, or without rational connection to the evidence. *Raybestos Products Co. v. Younger,* 54 F.3d 1234, 1244 (7th Cir.1995); *see Superbird Farms, Inc. v. Perdue Farms, Inc.,* 970 F.2d 238, 247 (7th Cir.1992) (describing corresponding Indiana standard as 'quite similar'). Under the federal standard, the court also must consider "whether the award is out of line compared to other awards in similar cases." *Levka v. City of Chicago,* 748 F.2d 421, 425 (7th Cir.1984); *see also Joan W. v. City of Chicago,* 771 F.2d 1020, 1023–1024 (7th Cir.1985). A comparison between the proof adduced at this trial and other cases involving damage awards for emotional distress discloses that the jury's award of $100,000 is monstrously excessive.

Dr. Schimizzi testified at trial that the lack of an offer on her uninsured motorist claim and the lack of reimbursement of her medical bills has caused her mental and emotional upheaval. She expressed an inability to understand how this could happen to an honest citizen and a belief that Farmers's treatment of her claims amounted to harassment that she could not understand.[6] She testified that

---

**5.** "An intentional injury occurs when the act is done for the purpose of causing the injury or with knowledge that the injury is substantially certain to follow." *Naughgle v. Feeney–Hornak Shadeland Mortuary, Inc.,* 498 N.E.2d 1298, 1301 (Ind.Ct.App.1986).

**6.** "I personally cannot understand how an honest citizen that has only told the truth and that the medical documents say I was injured severely and that the policy limits were clearly exceeded—what—eight years ago or something—a long time ago—the medical bills were there and noth-

the handling of her claims caused her to distrust people and cause her anxiety, extreme frustration,[7] stress, and anger.[8]

The court has reviewed Seventh Circuit cases, Indiana cases involving emotional distress awards, and cases from other jurisdiction in which damages were awarded for emotional damages caused by an insurer's tortious conduct. That review discloses that while an award of $100,000 for emotional distress is not unprecedented, such awards are rare, and are supported by facts the jury could not have found in this case.

### 1. Seventh Circuit

The court's research has not uncovered any case in which the Seventh Circuit has reviewed an emotional distress award in a suit based on an insurer's tort, but emotional distress damages have been reviewed in other settings. In *Stafford v. Puro*, 63 F.3d 1436 (7th Cir.1995), a case governed by Illinois substantive law, the jury awarded the plaintiff $450,000 for emotional distress caused by a tortious interference with a business relationship, an act that also violated the Illinois Wage Payment and Collection Act. Pursuant to the district court's post-trial ruling, the plaintiff accepted a remittitur reducing the emotional distress award to $100,000. On the defendant's appeal, the Seventh Circuit detailed the evidence supporting that award:

> ... Stafford detailed the financial problems he encountered as well as physical manifestations of stress arising from those problems. He stated that he could not pay his credit card bills, thereby ruining his credit rating. Stafford had to use all of his life savings to meet living expenses and eventually lost his home after taking out a second mortgage on it. These financial

difficulties caused Stafford to develop high blood pressure and a spastic colon, problems for which he sought medical attention.

63 F.3d at 1445. Dr. Schimizzi had lost her ability to work as a result of the automobile collision rather than as a result of Farmers's tortious conduct, and no evidence would support a finding that Farmers's tort caused any of the sort of problems detailed by Stafford.

The plaintiff in *Pieczynski v. Duffy*, 875 F.2d 1331 (7th Cir.1989), was a city employee who supported the wrong candidate. She was not discharged as a result of her political allegiance, but was subjected to extensive harassment that the jury could found was "a calculated campaign to humiliate her, drive her to resign, even break her health, in punishment for her association with the hated Vrdolyak." 875 F.2d at 1335. The plaintiff presented testimony of her priest, her doctor and her family that she had "experienced severe emotional distress which aggravated an existing back condition and caused other physical suffering, extending over a period of years," and the Seventh Circuit held that the jury's compensatory award of $95,000 (whether this figure included matters in addition to emotional distress cannot be told from the opinion) was not monstrously excessive. Again, although Dr. Schimizzi's emotional distress from Farmers's handling of her medical bills extended over a period of years, the record contains no evidence linking severe emotional distress or physical manifestations of that distress to Farmers's tort.

The jury's award of $82,081 in *Morales v. Cadena*, 825 F.2d 1095 (7th Cir.1987), was intended to compensate the plaintiff, who had been denied a public job because of his political activities, for emotional distress and lost

---

ing has been done. It just been harassment by the insurance company, but nothing done, and I cannot understand."

7. "Obviously, it caused me to question—I mean, I don't know. Let me think a minute. To me, I think they had an obligation to do something, and nobody did anything, and I feel that it has caused me to lose faith in people. It has caused me to distrust people because of some of the things that the insurance company has engaged in in trying to avoid paying this claim. It has caused me extreme frustration. It has caused

me anxiety. There has been a multitude of phone calls coming to my home that I can't even explain, other than I do think the insurance company is doing it."

8. "I would say the stress, extreme emotional distress.... Angry, I suppose.... Anxiety. Extreme shock at how I have been treated. I mean, the whole thing is just incredulous to me that this has gone on this long, and it has emotionally exhausted me and has physically exhausted me."

future wages. The Seventh Circuit held that the award was not monstrously excessive in light of the evidence of the plaintiff's emotional turmoil, depression, and career disruption. Dr. Schimizzi's award reflects only emotional distress; her career was shattered by the injuries suffered in the accident, not as a result of Farmers's tort.

The plaintiff in *Peeler v. Village of Kingston Mines,* 862 F.2d 135 (7th Cir.1988), was a police officer who arrested the town's mayor for a battery on a former mayor. In the next few hours, the arrested mayor got out of jail and fired the plaintiff. The jury in his retaliatory discharge case awarded $50,000 for emotional distress. The defendant appealed, arguing that no evidence supported such an award, an argument the Seventh Circuit dismissed as "strictly a lightweight", while noting that the award might have been less had the panel been the fact-finder. 862 F.2d at 138. In light of the surrounding publicity, the plaintiff was rejected in his employments by at least fourteen employers; he and his family were evicted from their home and lived in their truck for three days; the family of seven lived on a weekly food budget of $25 (the plaintiff sold the family furniture to raise even those funds), and ate only once a day; rags were used as diapers and the children were clothed only through charity; the plaintiff could provide no birthday or Christmas gifts to his children; the family pet died for want of money for a veterinarian; the plaintiff went sleepless, experienced a rise in blood pressure and a substantial weight gain from the poor diet.

*United States E.E.O.C. v. AIC Security Investigations, Ltd.,* 55 F.3d 1276 (7th Cir. 1995), was brought on behalf of a terminal cancer patient who had been discharged from his job in violation of the Americans with Disabilities Act. The jury's verdict included an award of $50,000 for emotional damages. The Seventh Circuit held that this portion of the award was not monstrously excessive:

Wessel claimed only emotional damages: basically depression, rage and fear resulting from his sudden firing. As the district court noted, Wessel's work was a very large part of his life. He took almost no vacations, and his son testified that he sometimes even put his company above his family. Coupled with that background, the evidence showed that Wessel's wrongful firing was emotionally wrenching, even though he underwent no formal psychological treatment. He was cut off from one of the major defining aspects of his life, and he was forced to watch his family suffer emotionally and financially as well. As the district court pointed out, the emotional burden on a person dying of cancer, perceiving himself as unable to adequately provide for his family, is considerably greater than that suffered by the ordinary victim of a wrongful discharge.

... Ultimately, it may be that Wessel did not really deserve as much as $50,000, but that is not the question. The question is whether that award was grossly excessive, and it was not.

55 F.3d at 1285–1286. Dr. Schimizzi, whose severely limited physical ability had ended the career for which she had worked all her life, similarly may have been found to be more vulnerable to emotional distress than other people whose medical bills remain unrecompensed, but nonetheless, the emotional distress flowing from the failure to pay the medical bills is qualitatively different from the emotional distress described in the *AIC Security* opinion.

In *Littlefield v. McGuffey,* 954 F.2d 1337 (7th Cir.1992), the plaintiff had been denied rental housing because of her boyfriend's race, and brought suit under federal law and Illinois law. Her state law claim produced a verdict of $50,000 for emotional distress, and the court of appeals held the award was not excessive. The evidence indicated that the plaintiff was so upset upon learning she could not move into the apartment after she already had cleaned and painted it that she cried for half an hour and left work without giving her employer an explanation. More significantly to the court, she found a terrifying note taped to her door that was certain to cause severe emotional distress.[9] 954 F.2d at 1347–1348.

9. "By THE Time you read this message Kiss your Niger [sic] friend goodbye Bitch > he's dead!!!"

The plaintiff in *Fleming v. County of Kane*, 898 F.2d 553 (7th Cir.1990), had been subjected to progressive discipline and then fired in retaliation for his speech on a matter of public concern, and as part of its damages award, the jury awarded $120,000 for emotional distress, a sum reduced to $40,000 by remittitur. On appeal, the court held that the adjusted figure was not monstrously excessive and was in line with other such awards. The plaintiff had testified to his embarrassment, humiliation, depression, headaches and sleeplessness; his doctor testified that the stress may have aggravated the plaintiff's physical condition. 898 F.2d at 561–562.

Damage awards for mental distress have been found to be excessive in several other Seventh Circuit cases. In *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219 (7th Cir.1995), Avitia had been discharged from his employment in retaliation for his complaint that his employer was violating the Fair Labor Standards Act. In addition to awarding Avitia the back wages due him and a like sum as liquidated damages, the jury awarded him an additional $21,000 for emotional distress. Avitia testified that when he was fired after working for the employer for thirteen years, he felt as though the Sears Tower had fallen on him, he was speechless, and cried when he got home, and he still felt the emotional pain by the time of trial. He found a new job within three months of his discharge, but had to leave that job when his son fell ill, and could not find a comparable job when his son improved. The Seventh Circuit held that the emotional distress award was too high by half:

> ... there is more than the momentary pang, the momentary breaking down and crying, in this case. Avitia testified that 'until now I can feel that.' He was testifying several years after he had been fired. Because he had worked for the same employer for so many years, it is plausible

that he would have been deeply distressed by what he regarded, or least persuaded the jury that he regarded, as an unjustified and unjust discharge. We do not think it was unreasonable for the jury to award him some damages for this hurt, even considerable damages; but $21,000 is too much. Judges and juries must not be casual with other people's money.

49 F.3d at 1229. A remittitur in the sum of $10,500 was ordered.

In *Ramsey v. American Air Filter Co., Inc.*, 772 F.2d 1303 (7th Cir.1985), the plaintiff had been awarded $75,000 for mental distress stemming from his racial discrimination practiced and condoned by his employer, including discipline, lay-off and a hostile work environment.[10] His family doctor testified that the ensuing unemployment had "preyed on him psychologically"; the plaintiff testified that two incidents of racially motivated reprimands left him feeling as though he wasn't human and as though he had been slapped, and a co-worker testified that those incidents had left the plaintiff upset. On appeal, the court concluded that, "This evidence clearly supports some award to compensate the plaintiff for the mental distress that he suffered.... In the absence of any evidence that plaintiff was treated for emotional harm or that he became depressed for any sustained period of time, however, this court finds that $75,000 is excessive compensation for the humiliation that plaintiff experience.... [A]n award of $35,000 is the outermost award that can be supported on this record." 772 F.2d at 1313.

The plaintiffs in *Phillips v. Hunter Trails Community Association*, 685 F.2d 184 (7th Cir.1982), had contracted for the purchase of an expensive home, only to have the rug pulled out from under them by the community homeowners' association due to their race.[11] The jury found violations of the Civil

**10.** *See also Moffett v. Gene B. Glick Co., Inc.*, 621 F.Supp. 244, 287 (N.D.Ind.1985) (following bench trial, district court awarded plaintiff $50,-000 for emotional distress resulting from harassment and retaliatory discharge; experts testified to need for prolonged psychotherapy to deal with anxiety that caused loss of sleep and appetite).

**11.** *See also United States v. Balistrieri*, 981 F.2d 916, 930–933 (7th Cir.1992) (upholding emotional distress awards of $2,000 each to testers who were humiliated, embarrassed and shamed by the housing discrimination their efforts uncovered; only the sufficiency of the evidence, and not the amount of damages, was attacked on

Rights Act of 1866 and the Fair Housing Act, and awarded the plaintiffs $25,000 each for humiliation and embarrassment. The Seventh Circuit reduced the award[12] to $10,000 per plaintiff, noting that past awards for intangible injuries to housing discrimination victims had ranged from $500 to $5,000, that the degree of anger and hurt should bear no correlation to the price of the property, and that punitive damages (and not compensatory damages) are to reflect the egregiousness of the defendant's conduct. 685 F.2d at 190–191.

In *Douglas v. Metro Rental Services, Inc.*, 827 F.2d 252, 256–257 (7th Cir.1987), the court contrasted the plaintiffs' emotional distress with the facts of *Phillips*. The husband-and-wife plaintiffs and their children were denied housing due to their race; after entry of default judgment, the district court awarded each plaintiff $10,000 for emotional distress. The *Douglas* plaintiffs suffered compensable anger, humiliation and disappointment, but unlike the *Phillips* plaintiffs, they had not been forced to live in hotels or with relatives while looking elsewhere from housing, in the course losing property and having cars stolen. The Seventh Circuit reduced the award to $2,500 per plaintiff, for a total of $10,000.

*Cygnar v. City of Chicago,* 865 F.2d 827 (7th Cir.1989), involved awards of $55,000 to each of several police officers who had been transferred from preferred positions due to their race and politics. The district court had ordered remittiturs reducing the awards to $15,000 each. The Seventh Circuit affirmed after examining awards ranging from $500 to $50,000 that had been affirmed in other cases involving unconstitutional firings, and noting that *Cygnar* involved transfers rather than firings.

### 2. Indiana

Although federal law governs the claim that the award was excessive, and although no prior Indiana case has addressed the excessiveness of an award for emotional distress flowing from an insurer's tort, the court

also notes the Indiana Court of Appeals's decision in *Groves v. First National Bank of Valparaiso,* 518 N.E.2d 819 (Ind.Ct.App. 1988), in which a husband and wife were awarded $100,000—apparently for emotional distress—in a suit for breach of contract and fraud with respect to the sale of a house. The court of appeals vacated the award:

> At trial, the Groves testified that they were frightened and angry when they learned they no longer had good title to the lot 43 property. These emotions are certainly understandable; anyone who is in danger of losing his house could be expected to experience anger and fear, especially where he spent long hours and borrowed substantial sums of money to make his house habitable. The Groves did not, however, introduce any evidence that they experienced any physical manifestations, sleeplessness, depression, or other observable indicia of emotional distress.
>
> \* \* \*
>
> We must conclude that, in the absence of evidence of any physical or psychological manifestation of mental anguish, the award of $100,000 is so high as to demonstrate passion or prejudice on the part of the jury. We therefore order a new trial on the issue of damages.

518 N.E.2d at 831–832.

### 3. Other Jurisdictions

Finally, the court has looked to other jurisdictions in which damages may be awarded for emotional distress caused by a breach of the insurer's duty to deal in good faith with the insured. In *Filasky v. Preferred Risk Mut. Ins. Co.,* 152 Ariz. 591, 734 P.2d 76, 82 (1987), the insurer had breached its obligation with respect to three separate loss claims in the course of one year; the jury awarded the plaintiff $100,000 for emotional distress and attorney fees incurred in achieving the payment of her claims. From the opinion, it appears that only $4,000 of the award reflected attorney fees. It also appears from the opinion that the plaintiff had been unable to make her house payments as

---

appeal), *cert. denied,* 510 U.S. 812, 114 S.Ct. 58, 126 L.Ed.2d 28 (1993).

**12.** Trial had been to the court rather than to a jury, so no remittitur was needed.

a result of the insurer's tort, and that governing Arizona law allowed recovery of damages for inconvenience, an element of damages not available under Dr. Schimizzi's Indiana law claim.

In *Salvator v. Admiral Merchants Motor Freight*, 156 Ill.App.3d 930, 109 Ill.Dec. 337, 509 N.E.2d 1349 (1987), the court upheld an award of $138,450. That sum included emotional distress, but also included unidentified sums for lost wages and medical bills. Mr. Salvator's employer/insurer had failed to defend an Oregon lawsuit against him, producing (in turn) a default judgment, the loss of the plaintiff's driver's license and hence (since the plaintiff was a truck driver) his livelihood, anger, embarrassment over unemployment, distress over inability to visit his children in another state, and heart problems.

### 4. Conclusion

The court recognizes that none of these cases compares precisely to Dr. Schimizzi's situation. Dr. Schimizzi had seen her lifelong dream of practicing medicine shattered by her disability (though not by Farmers's wrongdoing), and the jury reasonably could have found that her chronic pain left her more vulnerable to mental suffering than otherwise healthy persons who suffered from discrimination in employment or housing. The court also recognizes that "those awards were several years ago, and thus the current value of those awards is considerably greater. Comparability of awards must be adjusted for the changing value of money over time."[13] *United States E.E.O.C. v. AIC Security Investigations, Ltd.*, 55 F.3d at 1286. Still, an award for emotional distress must be placed in the context of the awards discussed above, and in the context of the tort for which such damages may be awarded.

██ Damages must be reasonable, and a tort claimant can recover consequential damages only for those injuries caused by the tortious conduct. The court found above that Farmers's handling of the uninsured motorist claim was not tortious. Dr. Schimizzi was not asked, and could not reasonably be expected, to differentiate her frustration and distress over the delay in the handling of her uninsured motorist claim from her frustration and distress over the non-payment of her medical bills, or from the natural suffering from her disabling injury. Health care providers who commented on Dr. Schimizzi's fixation on her arbitral and litigation battles with Farmers made no attempt to differentiate the effects of her pain and disability from the collision (which was not Farmers's fault), the handling of the uninsured motorist claim (which was not Farmers's tort), and Farmers's failure to deal on good faith with respect to the medical payments clause (the tort for which emotional distress damages may be awarded). Nobody who sat through this trial, however, could be left with the belief that her frustration with the handling of the medical bills was greater than her distress about the handling of the uninsured motorist claim. Dr. Schimizzi's attorneys directed only three requests to Farmers for payment of the medical bills—certainly enough to alert Farmers that the bills should be paid rather than ignored, but hardly demonstrative of great anguish on the insured's part. Much of the manifestation of her emotional distress, whether in statements to health care providers or in the bizarre lawsuits against Mr. LaSalvia, preceded any point in time at which Farmers could be said to have breached its duty of good faith with respect to the medical bills.

Without intending to deprecate her suffering, the court must note that Dr. Schimizzi did not lose her home, life savings and credit rating as a result of the defendant's tortious conduct, as did the plaintiff in *Stafford v. Puro*, 63 F.3d 1436; unlike the evidence in *Pieczynski v. Duffy*, 875 F.2d 1331, the mental distress she detailed as resulting from Farmers's tort cannot be characterized as "severe"; she did not have to live in a truck after eviction from her home and clothe children in rags, like the plaintiff in *Peeler v.*

---

**13.** Because of this, the court has considered only one case decided before 1985, *Phillips v. Hunter Trails Community Association*, 685 F.2d 184 (7th Cir.1982), and that case is considered only because it provided a critical guidepost in a 1987 case, *Douglas v. Metro Rental Services, Inc.*, 827 F.2d 252, 256–257 (7th Cir.1987).

*Village of Kingston Mines,* 862 F.2d 135; she received no threatening notes as did the plaintiff in *Littlefield v. McGuffey,* 954 F.2d 1337. It is true that Dr. Schimizzi lost her job, like the plaintiff *Salvator v. Admiral Merchants Motor Freight,* and indeed lost her career, as did the plaintiff in *Morales v. Cadena,* 825 F.2d 1095, and if her loss of her career is permanent, she may (like the plaintiff in *United States E.E.O.C. v. AIC Security Investigations, Ltd.,* 55 F.3d 1276) no longer have the opportunity to be productive in her final years, but the loss of the career is due to the accident, not to Farmers's handling of her medical claims. There is no evidence that Farmers's failure to pay her medical bills preyed on her psychologically, like the plaintiff in *Ramsey v. American Air Filter Co., Inc.,* 772 F.2d 1303. There is no evidence that the failure to pay her medical bills caused her to suffer from depression or sleeplessness of the sort that supported the award in *Fleming v. County of Kane,* 898 F.2d 553; the absence of such evidence was noted when the award in *Groves v. First National Bank of Valparaiso,* 518 N.E.2d 819, was vacated.

In light of the standards governing such awards, no reasonable jury could find that Dr. Schimizzi suffered $100,000 worth of emotional distress as a result of Farmers's breach of its duty to deal in good faith on the medical payments claim. That component of the jury's verdict must be vacated. The court grants Farmers's Rule 59 motion for a new trial on that issue, subject to Dr. Schimizzi's acceptance of a remittitur of $75,000, to allow the judgment to reflect an award of $25,000 for emotional distress, a sum reflective of the tort giving rise to the recovery and of other awards for emotional distress. The court notes that an award of $25,000 still is higher than the awards allowed in *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, *Phillips v. Hunter Trails Community Association,* 685 F.2d 184, *Douglas v. Metro Rental Services, Inc.,* 827 F.2d 252, or *Cygnar v. City of Chicago,* 865 F.2d 827.

### D. Punitive Damages

██ The jury also assessed punitive damages against Farmers in the sum of $600,000; Farmers challenges both the fact and the amount of that award. Farmers argues that, "The law requires evidence that is inconsistent with the hypothesis that the defendant's misconduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence, or such non-iniquitous human failing." This is no longer the law of Indiana:

The Court notes that the Court of Appeals has applied an incorrect standard of review for the award of punitive damage by considering whether the evidence excluded every reasonable hypothesis of innocent conduct and by indicating that a defendant is cloaked with the presumption that tortious conduct was noniniquitous human failing.... [T]hese two concepts ... have been superseded....

The correct standard of review for punitive damages is whether, considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find by clear and convincing evidence that the defendant acted with malice, fraud, gross negligence or oppressiveness which was not the result of a mistake of fact or law, honest error of judgment, overzealousness, mere negligence, or other human failing.

*Budget Car Sales v. Stott,* 662 N.E.2d 638, 639 (Ind.1996). Under this standard, there is more than enough evidence to support an award of punitive damages, as well as compensatory damages, for the breach of the duty to deal in good faith with respect to the medical payments provision.

### 1. Sufficiency of Evidence

Indiana law defines (and the court's jury instructions defined) gross negligence as an intentional failure to perform a clear duty in reckless disregard of the consequences to others' property so as to justify an inference of an utter indifference or conscious disregard for the rights of the insured. The jury reasonably could have found that the stopping of payment on the check without further inquiry was sufficient to justify an award of punitive damages. When Farmers chose to stop payment on the benefits check without

further inquiry, it knew that: (1) it had ignored the medical bills for more than a year (and perhaps nearly three years) without action before even evaluating the bills; (2) it had determined that Dr. Schimizzi was entitled to nearly $3,000 under the medical payment clause; and (3) another six months had passed and Dr. Schimizzi still had not received her money. Accordingly, although Farmers may have had no reason to know why the check still would be outstanding, Farmers knew that no fewer than nineteen months (and perhaps as many as forty-one months) had passed since Farmers received the medical bills, and Dr. Schimizzi still had not received even the moneys Farmers had decided were due to her under the policy, much less reimbursement of her remaining bills.

Nonetheless, Farmers elected to cancel the check and say nothing about it unless and until Dr. Schimizzi made still another demand. A reasonable juror could have found that decision to have been intentional, in reckless disregard of the consequences to Dr. Schimizzi's receipt of her property (the $2,900 check), and indicative of a conscious disregard for Dr. Schimizzi's rights under the policy. Farmers still had paid none of the medical bills when this case went to trial in March 1996. Sufficient evidence supports the jury's decision to award punitive damages.

### 2. Excessiveness of Punitive Damages

■ The amount of the punitive damages award is a separate issue. As is discussed above, federal law provides the standard for evaluating a claim that a federal jury awarded excessive damages, even when state law provides the rule of decision. Nonetheless, a state allows punitive damage awards in a given class of cases on the basis of policy established by state law, and a review of the excessiveness of an award of punitive damages must be undertaken with due regard to the state's policy. *See DeRance, Inc. v. PaineWebber Inc.*, 872 F.2d 1312, 1328 (7th Cir.1989) (referring to purpose of punitive damages under Wisconsin law in deciding whether punitive damages were excessive in case decided under Wisconsin law); *see also*

*BMW of North America, Inc. v. Gore,* —— U.S. ——, ——, 116 S.Ct. 1589, 1595, 134 L.Ed.2d 809 (1996) ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition.... For that reason, the federal excessiveness inquiry appropriately begins with an identification of the state interests that a punitive award is designed to serve.").

■ Indiana law permits punitive damages awards to punish defendants and deter those and others like them from like conduct in the future. *Erie Ins. Co. v. Hickman by Smith,* 622 N.E.2d 515, 520 (Ind.1993); *Bud Wolf Chevrolet, Inc. v. Robertson,* 519 N.E.2d 135, 137–138 (Ind.1988). To evaluate that policy in the context of punishing insurers for, and deterring insurers from, bad faith dealing with insureds, it should not be improper to review Indiana cases in which punitive damages were awarded against an insurer. That review discloses no case in which an award anywhere near $600,000 was upheld.

In *Guarantee Trust Life Ins. Co. v. Palsce,* 641 N.E.2d 1266 (Ind.Ct.App.1994), the plaintiff was defrauded as to the scope of coverage under a medical insurance policy; rather than paying the $25,000 the insurer led the plaintiff to believe she would be paid for the loss of her son's eye, the insurer paid less than $1,100. The jury awarded the plaintiff $25,000 in compensatory damages and an additional $25,000 in punitive damages. The court of appeals affirmed the amount of the award in the face of the defendant's challenge, noting that the plaintiff had introduced evidence that the insurer had approximately $159 million in assets. Dr. Schimizzi presented no evidence of Farmers's net worth.

In *United Farm Bureau Mut. Ins. Co. v. Ira,* 577 N.E.2d 588 (Ind.Ct.App.1991), the insurer had refused, without justification, to pay the insured's medical bills, which totaled a little under $19,000. In a proceeding for indirect contempt for failure to comply with an agreed declaratory judgment that required the insurer to pay the insured's medical bills, the court awarded additional compensatory damages of $37,000 and punitive

damages of $105,000. The court of appeals affirmed the punitive damage award in the face of the defendant's challenge.

In *Transport Ins. Co. v. Terrell Trucking, Inc.*, 509 N.E.2d 220 (Ind.Ct.App.1987), the insurer's adjuster responded to the insured's calling him a "crooked son of a bitch" by putting the insured's folder "to the bottom of the pile" and "let [him] set" for six months before settling on payment for truck damage. The insured's trucking business lost money as a result of the delay. The jury awarded $58,365 in compensatory damages and $6,000 in punitive damages. The court of appeals upheld the award of punitive damages; the insurer does not appear to have claimed that the punitive damages award was excessive.

*Riverside Ins. Co. v. Pedigo*, 430 N.E.2d 796 (Ind.Ct.App.1982), involved a residential fire loss claim. The insurer suspected the insureds were the arsonists, but did not so inform the insureds, instead misrepresenting the reasons for delay while it investigated. The jury awarded $51,000 in compensatory damages (later reduced by a $4,400 remittitur) and $50,000 in punitive damages. The court of appeals affirmed the punitive damages award; the insurer apparently did not challenge the amount of the punitive damages award.

In *Vernon Fire & Cas. Ins. Co. v. Sharp*, 264 Ind. 599, 349 N.E.2d 173 (1976), the insurers refused to pay an insured for a fire loss unless the insured arranged for settlement of a separate claim of the insured's manager arising from the same fire, knowing of the insured's desperate need for funds, despite the insured's clear right to payment for his own loss. The jury awarded the insured compensatory damages of $31,250 (reduced to $23,527.02 on appeal) and punitive damages of $17,000 against each of two defendants. The punitive damage award was held to be supported by the evidence and law; the amount was not in issue.

*Rex Ins. Co. v. Baldwin*, 163 Ind.App. 308, 323 N.E.2d 270 (1975), involved an unjustified refusal to pay life insurance benefits. After a bench trial, the trial court awarded compensatory damages of $1,000 and punitive damages of $2,000. On appeal, the puni-

tive damages award was upheld as warranted and not excessive.

In *Physicians Mut. Ins. Co. v. Savage*, 156 Ind.App. 283, 296 N.E.2d 165 (1973), the insurer fraudulently denied hospital and accidental death benefits on the basis of a rider that was not part of the insurance contract. The trial court awarded compensatory damages of $10,108.17 and $50,000 in punitive damages. The court of appeals held that in light of evidence that the insurer's total assets exceeded $37 million and its total liabilities exceeded $28 million, the amount of the punitive damage award "was not excessive when considered in relation to the evidence available to the trial court." 296 N.E.2d at 170.

In *State Farm Mut. Auto. Ins. Co. v. Shuman*, 175 Ind.App. 186, 370 N.E.2d 941 (1978), the insured was killed in a truck-train collision, triggering the policy's accidental death provisions unless the insured had committed suicide. The insurer, however, did not disclose the accidental death provision to the insured's administratrix, and instead sought her settlement of "all claims to everything" in exchange for payment for the truck; when asked specifically about the accidental death provision, the insurer falsely claimed the provision was inapplicable because the insured was an alcoholic, and tried to convince the unsophisticated administratrix to settle for half the claim. The jury awarded $10,000 in compensatory damages under the accidental death provision and an additional $10,000 in punitive damages. The verdict was upheld; the insurer does not appear to have challenged the award as excessive.

In *Liberty Mut. Ins. Co. v. Parkinson*, 487 N.E.2d 162 (Ind.Ct.App.1985), the insurer told its insured that if she filed a claim based on a hit and run accident, her insurance rates would go "sky high" and the policy would not cover the cost of a rental car while the insured's car was being repaired. Some time later, the insured retained an attorney and a partial settlement agreement provided benefits. The trial court awarded the insured an additional $2,000 in damages to compensate her for several months without an automobile and abandoning her own home for her parents home in an effort to save for another

car, and $40,000 in punitive damages. The punitive damage award was upheld on appeal, though there appears to have been no claim that the award was excessive.

The court's analysis of cases decided under Indiana law concludes with *Hamed v. General Accident Ins. Co. of America*, 842 F.2d 170 (7th Cir.1988), in which the insurer simply ignored its insured's fire claim until nearly a year after the insured filed its proof claim when, in response to suit filed by the insured, the insurer finally denied coverage and raised arson as a defense. The jury awarded $75,000 in compensatory damages and $100,000 in punitive damages. On appeal, the insurer attacked both fact and amount of the punitive damage award. After rejecting the insurer's claim that the absence of net worth evidence foreclosed any punitive damage award, the court rejected the insurer's attack as follows: "There is no evidence in this record that the award of $100,000 was unreasonably high in relation to General's net worth or to the damages sustained by MF." 842 F.2d at 175.

In *BMW of North America, Inc. v. Gore*, — U.S. ——, —— – ——, 116 S.Ct. 1589, 1598–99, 134 L.Ed.2d 809 (1996), the Supreme Court identified three "guideposts" to consider in evaluating the excessiveness of a punitive damage award in another setting: "the degree of reprehensibility of the nondisclosure; the disparity between the harm or potential harm suffered by [Dr. Schimizzi] and [her] punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." The *BMW* Court considered whether a state law punitive damages award entered in a state court violated the Constitution's Due Process Clause, an issue not present in this case. Nonetheless, the Court examined whether the award was "grossly excessive", an inquiry akin to that posed here. In neither inquiry are any of these "guideposts" outcome-determinative, but they may be helpful in determining whether a federal jury's award may survive; if a verdict would be unconstitutionally excessive if rendered in a state court, it is difficult to see how the verdict would be permissible simply because it was returned by a federal

jury applying state law. Further, the "guideposts" infuse discipline into the reasoning process. Accordingly, the court turns to the "guideposts."

*(i) Reprehensibility.* The *BMW* Court suggested a hierarchy of reprehensibility, with acts of violence or threats of bodily harm the most reprehensible, followed in order by acts in reckless disregard for others' health or safety, affirmative acts of trickery and deceit, and finally, acts of omission and mere negligence. *Id.* at —— – ——, 116 S.Ct. at 1598–1602. Farmers's tort includes the affirmative act of stopping payment on the uncashed check, but otherwise consists of omissions in reckless disregard of Dr. Schimizzi's rights under the policy, though not in reckless disregard of her health or safety. Farmers had a sufficient number of Dr. Schimizzi's medical records to demonstrate that its failure to pay the medical bills was not preventing her from obtaining necessary medical treatment. Accordingly, while Farmers's tort may have been more reprehensible than the conduct in issue in *BMW* (because Farmers committed the affirmative act of stopping payment), it was only slightly so. Of the conduct in issue in *BMW*, the Court said, "That conduct is sufficiently reprehensible to give rise to tort liability, and even a modest award of exemplary damages, does not establish the high degree of culpability that warrants a substantial punitive damages award." *Id.* at —— – ——, 116 S.Ct. at 1601–02.

*(ii) Ratio of Punitive and Compensatory Damages.* The second of the "guideposts" identified by the *BMW* Court is the disparity between the actual or potential harm to the plaintiff and the punitive damages award, a concept the *BMW* Court evaluated under the title "Ratio". *Id.* at —— – ——, 116 S.Ct. at 1601–03 ("The $2 million in punitive damages awarded to Dr. Gore by the Alabama Supreme Court is 500 times the amount of his actual harm as determined by the jury."). Unless such an approach is taken as outcome-determinative, it is not new to this circuit; *Hamed v. General Accident Ins. Co. of America*, 842 F.2d 170, 175 (7th Cir.1988), teaches that it is appropriate to consider the relationship of the punitive damage award to

the actual damages sustained by the insured. As discussed above, Indiana law does not allow punitive damages to be assessed for simple breach of contract; the punitive damage award must be based on Farmers's tortious breach of its duty of good faith dealing on the medical payments provision. Dr. Schimizzi's actual damages for that tort consist of the $19,432.27 that Farmers tortiously refused to pay, plus a sum for emotional distress—which the court has found could not reasonably exceed $25,000—but does not include the $250,000 that Farmers owed under the uninsured motorist clause. Thus, her actual damages on the tort claim do not exceed $44,432.27. The jury's award of $600,000 is more than 13 times the actual damages.

*(iii) Comparison to Criminal Penalties for Similar Conduct.* The court need not identify a similar Indiana crime to evaluate this factor, because even assuming Farmers's handling of Dr. Schimizzi's medical payments claims was felonious, every felony under Indiana law is punishable by a maximum fine of $10,000. *See* IND.CODE §§ 35–50–2–4, –5, –6, –7. Thus, a $600,000 economic sanction would be substantially greater than any criminal fine.

Nothing in the court's review of Indiana cases suggests that punitive damages award of $600,000 in this case is necessary to vindicate the policy concerns that led Indiana's courts to hold insurers liable for punitive damages. None of the Indiana cases involved an award of anything near $600,000, and only one involved an award of punitive damages in a sum more than 13 times the actual damages; in that one case, *Liberty Mut. Ins. Co. v. Parkinson,* 487 N.E.2d 162, the award was 20 times the compensatory damages award, but the compensatory damage award was only $2,000. Indeed, if the moneys Liberty Mutual paid to Parkinson in the partial settlement are considered, her actual damages were $8,099.33, meaning that the punitive damages award was less than five times greater than the actual damages.

This comparison does not end the inquiry; "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *BMW of North America, Inc. v. Gore,* —— U.S. at ——— ———, 116 S.Ct. at 1602–03. This is not, however, such a case: Farmers's conduct does not rank high on the reprehensibility scale, Dr. Schimizzi's economic injury occasioned by non-payment is easily ascertained, the court already has considered damages for Dr. Schimizzi's emotional distress (the factor that is difficult to determine) in examining the ratio, and Dr. Schimizzi's economic damages were not small.

The court recognizes that its review of these Indiana cases is a limited methodology: none of the cases held that the trier of fact could not have assessed more punitive damages had it believed it appropriate; none of the cases reversed as excessive, or imposed a ceiling on, an award of punitive damages against an insured. Nonetheless, this review of cases over the past twenty years is instructive concerning the amount of punitive damages needed to vindicate the public policy behind Indiana law. Those cases point in the same direction as do the "guideposts" identified by the Supreme Court. Considering the actual damages suffered by Dr. Schimizzi as a result of the tortious conduct—not more than $45,000—and considering the nature of the tortious conduct—ignoring medical bills worth less than $20,000 while dealing with an uninsured motorist claim worth $250,000—the court believes it is clear that the punitive damages award of $600,000 is monstrously excessive and without rational connection to the evidence.

Dr. Schimizzi proved her entitlement to an award of punitive damages. It cannot be said with certainty what her jury tried to achieve in fixing the amount of those damages where it did. If it is assumed that the jury found tortious conduct in the handling of the uninsured motorist claim as well as the medical payments claim, the ratio of punitive damages to compensatory damages the jury

787

tried to award would be 3:2 [14]; if it is assumed that the jury found tortious conduct only in the medical payments claim, the ratio of punitive damages to compensatory damages the jury tried to award would be 4:1 [15]; it might also be assumed that the jury strove for no particular ratio, and simply believed $600,000 was appropriate to punish Farmers and deter Farmers and others. The jury's rationale simply cannot be known, and a court walks on very thin ice when it attempts to divide a jury's award between categories of compensable damage.[16] *See Durant v. Surety Homes Corp.*, 582 F.2d 1081, 1085–1086 (7th Cir.1978). Nonetheless, the jury plainly intended to award a significant amount in punitive damages, and the evidence supports a significant award of punitive damages. Giving due regard to these concerns, the court does not believe that a punitive damages award of $135,000 would be excessive.

Accordingly, the court will grant the defendant's motion for new trial unless the plaintiff accepts a remittitur in the amount of $465,000 with respect to punitive damages, reducing the punitive damage award to $135,-000.

### III. PREJUDGMENT INTEREST

Dr. Schimizzi seeks to have the judgment amended to provide for prejudgment interest on her contractual recoveries.

Farmers first contends that Dr. Schimizzi's motion was not filed within ten days of the judgment as required by Fed. R.Civ.P. 59(e). Farmers is incorrect. Judgment was entered on March 27. On April 10, the court received Dr. Schimizzi's motion by facsimile transmission, a process that is permissible if allowed by the district court, Fed. R.Civ.P. 5(e), and throughout the course of this case, this court has accepted such filings if followed by a mailed original copy. The April 12 receipt of the original of Dr. Schimizzi's motion does not mean that her motion was not filed until then; the motion was filed on April 10, a date both parties agree was within the ten days allowed by Rule 59(e).

Indiana law entitles a successful plaintiff to prejudgment interest if, although liability is disputed, the amount of damages was ascertainable as of a particular time according to known standards of valuation. *Simmons v. Pinkerton's, Inc.*, 762 F.2d 591, 607–608 (7th Cir.1985). Dr. Schimizzi contends that her damages under the policy provisions were ascertainable by January 19, 1993: her entitlement under the uninsured motorist provision exceeded the policy limits, and so was ascertainable at $250,000, and her medical expenses of $10,115.05 submitted by that date were no less ascertainable. The court agrees with Dr. Schimizzi.

Farmers argues in response that even as late as the trial, Dr. Schimizzi testified that her damages were continuing and unresolved, and her experts testified that future recovery would be required. Farmers's obligation to Dr. Schimizzi under the uninsured motorist provision, however, was capped when it reached $250,000; since Dr. Schimizzi's lost wages alone exceeded $250,000 by January 19, 1993, what has happened since then or what happens hereafter simply does not implicate Farmers. Farmers's obligation to Dr. Schimizzi under the medical payments provision was capped five years after the collision, a period that had elapsed when Farmers had $10,115.05 in medical bills before it in January 1993; Farmers had no liability for any medical expenses Dr. Schimizzi might have incurred, or still might incur, after that five-year period.

---

**14.** The jury attempted to award compensatory damages of $250,000 on the uninsured motorist claim, $50,000 on the medical payments claim, and $100,000 for emotional distress, for a total of $400,000 in compensatory damages.

**15.** The jury attempted to award $50,000 on the medical payments claim, and $100,000 for emotional distress, for a total of $150,000 in compensatory damages.

**16.** Indeed, one court has stated that when a compensatory damages award is set aside because of excessiveness, any punitive damages award that might have been interwoven with the compensatory damages award should be set aside, as well. *Rodgers v. Fisher Body Div'n, General Motors Corp.*, 739 F.2d 1102, 1109 (6th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 821 (1985). This does not appear to be the law of the Seventh Circuit.

Farmers argues further that difficult questions of liability remained for decision by the trier of fact after January 19, 1993. The course of the trial proves the truth of that assertion, but it does not affect Dr. Schimizzi's right to prejudgment interest upon resolution of the liability issue. *See State Farm Fire & Cas. Ins. Co. v. Graham,* 567 N.E.2d 1139, 1141–1142 (Ind.1991) (prejudgment interest proper when insurer contended policy was void but did not otherwise dispute amount of claim).

The parties do not address this issue, but a federal court must employ the federal rate of interest on judgments rather than Indiana's statutory interest rate. *Travelers Ins. Co. v. Transport Ins. Co.,* 846 F.2d 1048, 1053–1054 (7th Cir.1988). The court must calculate the amount of prejudgment interest to be awarded; simply ordering payment of prejudgment interest creates no final judgment. *Pace Communications, Inc. v. Moonlight Design,* 31 F.3d 587, 591 (7th Cir.1994). The current rate for interest on judgments in federal court is 5.60 percent. By the court's calculation, when that figure is applied to the $250,000 uninsured motorist award, it produces a daily interest figure of $38.36; when applied to the $10,115.05 medical payment figure that was ascertainable as of January 19, 1993, it produces a daily interest figure of $1.55. 1,220 days have elapsed since January 19, 1993, so Dr. Schimizzi is entitled to prejudgment interest in the sum of $46,799.20 on the uninsured motorist claim and prejudgment interest in the sum of $1,891.00 on the medical payments claim.

## IV. ATTORNEY FEES

Finally, Dr. Schimizzi seeks an award of $113,720 in attorney fees to be assessed as part of the costs in this case. As authority for her requests, she cites Fed. R.Civ.P. 54, District Rule 54.1, and IND.CODE § 34–1–32–1. Rule 54 and District Rule 54.1 establish time limits for the filing of fee petitions when another provision of law provides for recoverability of fees, but do not provide authority for an attorney fee award. IND.CODE § 34–1–32–1 provides for a fee award in frivolous litigation. In its response, Farmers "suggests" that IND.CODE § 34–1–

32–1 is a procedural provision that does not apply in federal diversity suits, rather than a substantive provision. Resolution of Farmers's "suggestion" would require extensive analysis, *see, e.g. S.A. Healy Co. v. Milwaukee Metropolitan Sewerage Dist.,* 60 F.3d 305 (7th Cir.) (considering applicability of Wisconsin statute providing for double costs from date of refused settlement offer), *cert. denied,* —— U.S. ——, 116 S.Ct. 566, 133 L.Ed.2d 491 (1995), but is unnecessary in this case because even if the state statute governs proceedings in federal courts applying Indiana substantive law, it does not apply here.

Farmers's defense of Dr. Schimizzi's claims was far from frivolous. Farmers presented considerable evidence that would, if credited by the jury, have allowed a finding that Dr. Schimizzi was not disabled, or that her disability and medical treatments were not attributable to the May 8, 1987 accident. The jury's rejection of that evidence does not render Farmers's litigation posture groundless or frivolous. *Davis v. Sponhauer,* 574 N.E.2d 292, 302 (Ind.Ct.App.1991). Although Farmers never raised the causation issue with respect to the medical payment provision in the arbitration proceedings, its defense to that claim in this litigation was not frivolous. Nothing about Farmers's defense in this lawsuit was frivolous within the meaning of IND.CODE § 34–1–32–1. *See Kahn v. Cundiff,* 543 N.E.2d 627 (Ind.1989). The case upon which Dr. Schimizzi relies, *United Farm Bureau Mut. Ins. Co. v. Ira,* 577 N.E.2d 588 (Ind.Ct.App.1991), requires no different holding; the insurer in that case already was a judgment defendant when it dealt with the insured's additional medical bills, and even at trial never presented a basis for its refusal to pay the bills.

Dr. Schimizzi cites Fed.R.Civ.P. 11 in passing, but does not identify any paper or pleading filed by Farmers that she contends violated that rule, does not identify which provision of the rule she believes to have been violated, and does not identify which version of the rule (which was amended substantially effective December 1, 1993, during the pendency of this action) she contends applies to any alleged violation. According-

ly, the court need not address the suggestion that Farmers has violated Rule 11.

### V. CONCLUSION

This court, out of utmost respect for the system of trial by jury, does not ordinarily set aside jury verdicts. This, however, is no ordinary jury verdict. For the reasons set forth above, the judgment would have to be amended to reflect a reduction in the medical bills for which Farmers is liable and to reflect prejudgment interest. As a whole, however, the judgment must be vacated due to the excessive awards for emotional distress and punitive damages; the Seventh Amendment precludes those awards from being "altered" as a matter of law. Unless Dr. Schimizzi accepts a remittitur in the sum of $521,877.53 (or the parties agree on another disposition of the case), a new trial must be had. The court computes the remittitur as follows:

| Element of Verdict | Jury Award | As Amended | Remittitur Figure | Necessary Change |
|---|---|---|---|---|
| Uninsured Motorist | $250,000 | 296,799.20 [17] | | +46,799.20 |
| Medical Payments | .$50,000 | 21,323.27 [18] | | −28,676.73 |
| Emotional Distress | $100,000 | | 25,000 | −75,000.00 |
| Punitive Damages | $600,000 | | 135,000 | −465,000.00 |
| Remittitur | | | | −521,877.53 |

Accordingly, the court now:

1. DENIES the plaintiff's request for assessment of attorney fees (filed April 8, 1996);

2. GRANTS the plaintiff's motion for prejudgment interest (filed April 10, 1996);

3. DENIES the defendant's motion for judgment as a matter of law (filed April 8, 1996);

4. GRANTS the defendant's motion to alter and amend the medical payments portion of the judgment (filed April 8, 1996); and

5. CONDITIONALLY GRANTS the defendant's motion for new trial (filed April 8, 1996). If the plaintiff does not, within thirty days of the date of this order, accept a remittitur in the sum of $521,-877.53, producing an amended judgment in the amount of $478,122.47 plus interest at the rate of $39.91 per day from the date of this order, a new trial shall be had, consistent with the holdings in this memorandum.

SO ORDERED.

---

17. This figure reflects the $250,000 policy limit plus $46,799.20 in prejudgment interest.

18. This figure reflects the agreed amendment to reflects liability under the medical payment provision in the sum of $19,432.27, plus prejudgment interest in the sum of $1,891.00.